# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Avraham Goldstein,

     *Plaintiff*

     v.                       **Civil Action No. 1:25-cv-475**

City University of New York, et. al.,

     *Defendants*

## DEFENDANT NADIA SALEH'S MOTION TO DISMISS

COMES NOW Defendant Nadia Saleh and hereby moves this Court to dismiss Plaintiff's complaint against her pursuant to Fed. R. Civ. P. 12 and submits the included brief in support.

## SUMMARY

Plaintiff Goldstein, an assistant professor at the Borough of Manhattan Community College (BMCC) at the City University of New York (CUNY), alleges nine counts against multiple defendants, without clearly identifying them or their alleged misconduct. All are allegations of discrimination, harassment, unequal treatment, and/or retaliation against him under various federal, state, and local laws against others affiliated with CUNY, including Defendant Nadia Saleh. Plaintiff's sprawling and confusing complaint and the myriad legal conclusions he has drawn from them ultimately arise from several core factual allegations:

A) that he took issue with educational/advocacy programming coordinated by a BMCC/CUNY-affiliated Social Justice and Equity Center, where Ms. Saleh was a Coordinator, condemning the State of Israel as a purveyor colonialism and apartheid; and that Plaintiff complained to "every person on the BMCC SJEC website", including Ms. Saleh, about this program and sought an "anti-discrimination" program putting forward his alternative viewpoint;

B) That an unknown person(s) accused Plaintiff of being a racist on a website shortly after he complained;

C) That Ms. Saleh and others signed a petition describing Plaintiff's point of view about the SJEC as "a Zionist tactic" and repeating allegations against Israel that

Plaintiff disagrees with;

D) That Ms. Saleh filed a complaint against Plaintiff alleging that his role in an article about the poster display on a pro-Israel website were defamatory and racist;

E) That Plaintiff filed multiple complaints at various times with various personnel at CUNY alleging that he was being discriminated against based on some or all of the above, but his complaints were not addressed promptly and were ultimately thrown out; and relatedly, that CUNY investigated Ms. Saleh's complaint before finding it unsubstantiated rather than dismissing it outright or at a more preliminary stage;

F) That CUNY did not provide Plaintiff with an advisory council position that would have helped him obtain a promotion.

Notably, Plaintiff does not allege that Ms. Saleh had or has any role in the investigation of any of his complaints about anyone, including her (E), that she was responsible for anonymous online commments describing him as a racist (B), or that she played any role in any decision about his role on the advisory council (F). As such, the allegations involving Ms. Saleh essentially amount to complaints that she produced educational programming he disagreed with (A), defended the programming publicly from criticisms he and others made alleging it was anti-Semitic (C), and filed a complaint against him over the content of an article that

quoted him regarding the programming (D), and that these facts collectively establish liability.[1] For the reasons described herein, Plaintiff's complaint is meritless and should be dismissed.

## ARGUMENT

### I)    Plaintiff's complaint is a shotgun pleading.

As indicated above, it is difficult to figure out precisely what Plaintiff is accusing Ms. Saleh of doing. First, Plaintiff makes little effort to indicate which of his myriad and often redundant claims apply to which defendant. While some paragraphs in the Plaintiff's claims for relief specify Ms. Saleh or other particular defendants, others simply allege claims against ambiguous "defendants". See SAC at ¶¶ 132, 134-137, 155, 174, 181, 186, 192-193, 198, 201-202, 204-206, 210, 211, 215-219, 227-228, 234-238, 244, 249-252, 256, 260-263 (variously making allegations against "defendants"). Some claims, specifically, claims V, VI, and IX, mention "defendants" but do not mention any allegation specific to Ms. Saleh at all.

Further, the complaint also repeats the verbatim the phrase "Defendant Saleh

---

1    Defendant's assessment of which factual allegations are actually being made against Ms. Saleh are based on a good-faith reading of Plaintiff's shotgun pleading. In the event that the Court (somehow) finds that Plaintiff's factual allegations are in some other way directed at Ms. Saleh, this motion should be construed as a motion for a more definite statement explaining what, specifically, Plaintiff alleges against Ms. Saleh that would make responsible for any claims Plaintiff has put forth based on other alleged conduct.

created a hostile work environment for Plaintiff when she filed a baseless

allegation of racism against Plaintiff and later endorsed on behalf of Defendants'

SJEC Multi-Cultural Center an antisemitic petition and signed it in her own name"

within Counts I, II,, and VII (see SAC at ¶¶128, 151, 171, and 230; emphasis

added), and the slightly different "Defendant Saleh retaliated against Plaintiff when

she filed a baseless allegation of racism against Plaintiff and later endorsed on

behalf of Defendants' SJEC Multi-Cultural Center an antisemitic petition and

signed it in her own name" within Counts III, IV, and VIII (see SAC at ¶¶ 188,

245; emphasis added).

Finally, Plaintiff alleges that specific defendants, including Ms. Saleh,

"failed to adequately respond to Plaintiff's reports of antisemitic, anti- Israeli

treatment he endured during his employment" for Counts I, II, and VII (see SAC at

¶¶ 130, 153, 232) without properly specifying any impropriety, obligation, or

authority to do so, effectively repeating a conclusory statement without any

substantiation. This allegation is caked into three counts that request relief on

separate bases of law.

This is plainly a shotgun pleading. See, e.g. McArter & English v. Jarrow

Formulas, Inc. 2020 U.S. Dist. LEXIS 155704 at *11-12 (D. Conn 2020) (" A

shotgun pleading contains multiple counts where each count adopts the allegations

5

of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. Shotgun pleadings also refer to those that are replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action and pleadings in which the causes of action are not separated out into different counts") (internal citations omitted); see also Alexander v. Syracuse 2018 U.S. Dist. LEXIS 210687 at *8 (N.Y.N.D 2018) (identifying shotgun pleading that "failed to connect [Plaintiff's] various theories of liability to the particular defendant or defendants allegedly responsible for each violation" and rendering it "virtually impossible to know which allegations of fact were intended to support which claim(s) for relief") (internal citations omitted).

The complaint should be dismissed in that the allegations fail to properly state a claim under the applicable pleading standards of the Federal Rules. However, out of an abundance of caution, Ms. Saleh answers Plaintiff's allegations as best as Counsel can make them out.

**II)   Plaintiff Fails to State Claims for Hostile Work Environment or Harassment Under Any Applicable Law Against Ms. Saleh (Counts I, II, and VII).**

Plaintiff's claim that Ms. Saleh is guilty of engaging in discrimination by filing an anti-discrimination complaint – no matter how meritless Plaintiff

6

considers it to be – is outrageous on its face. Filing a complaint is protected activity; it is not itself grounds for liability. Similarly, signing a petition in response to Plaintiff's political statements is equally protected speech. For the reasons described herein, any claim of discrimination / hostile work environment / harassment based on this conduct fails.

Plaintiff claims that Ms. Saleh filed a complaint against him in March of 2023 in response to an article which quotes Plaintiff and criticizes the poster display. Plaintiff specifically notes that his understanding of the complaint is based on an investigatory notice which suggested that Ms. Saleh had accused him of contributing information to an article that included false information about her based on her ethnicity and religion and sharing it on social media. SAC at ¶ 105. Notably, Plaintiff claims he was not made aware of the complaint until July 13, 2023, and that the complaint was dismissed as unsubstantiated on August 12, 2023. SAC at ¶¶ 104 & 116. Plaintiff additionally admits that he contributed a statement to the source that published the article subject to Ms. Saleh's alleged complaint, but denies providing specific pieces of information about Ms. Saleh. SAC at ¶¶ 48-62.

Plaintiff separately and in conjunction alleges that Ms. Saleh signed a petition in the name of SJEC, and that the content of this political statement was anti-Semitic where it made various critiques of Israel. SAC at ¶¶. 78-83.

Additionally, Plaintiff claims that the petition's references to "Zionist tactics" and calls for events about "Zionism" were a response to his personal call for an educational series about what he calls Jewish indigeneity; notably, the quoted portions of the petition do not reference Plaintiff at all and Plaintiff does not suggest that the petition does so. SAC at ¶ 83.

Plaintiff claims that these acts "created a hostile work environment" and therefore constituted "religion / national origin discrimination" under Title VII of the Civil Rights Act (Count I) and under the New York City Human Rights Law (herein "CHRL") (Count II), or "discrimination and harassment" under the New York State Human Rights Law (herein "SHRL") (Count VII).

Hostile work environment claims under Title VII are based on the statute's language prohibiting an employer from discriminating with respect to "compensation, terms, conditions, or privileges", and ensuing conclusion that a workplace permeated with "discriminatory intimidation, ridicule, and insult" can be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment". 42 U.S.C. § 2000e-2(a)(1); Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 65, 67 (1978). To state a hostile work environment claim under Title VII, a plaintiff must allege complained of conduct that is objectively severe or pervasive, meaning an environment that a

reasonable person would find hostile or abusive; that the plaintiff subjectively perceives to be hostile or abusive; and the environment is as such because of the plaintiff's protected characteristic. Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007). Claims under the SHRL and CHRL are similar but encompass broader conduct. Under the SHRL, actionable harassment need not "be considered severe or pervasive," and "[s]uch harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions, or privileges of employment because of the individual's membership in one or more...protected categories." 18 NYS § 296(h). The CHRL is even broader, rejecting the "severe or pervasive" standard and holding as actionable a preponderance of evidence that someone has been treated "less well than other employees" because of a protected characteristic, barring liability for "petty slights" or "trivial inconveniences". See Williams v. NYC Hous. Auth., 61 A.D.3d 62, 78-80 (App. Div. 1st Dept. 2009).

**A)      Count I must be dismissed because Ms. Saleh is not Plaintiff's employer.**

First, Plaintiff fails to state a claim under Title VII (Count I) because Ms. Saleh is not alleged to be Plaintiff's employer and in fact, Plaintiff admits he did not know who Ms. Saleh was until well after she filed a complaint against him. As Title VII only applies to employer entities and not impose liability on individuals, the claim must be dismissed. See Lore v. City of Syracuse, 670 F.3d 127, 169 (2d

9

Cir. 2017) (collecting cases). The SHRL and CHRL permit claims against individuals where they are accused of aiding and abetting an impermissible action; while this is far from clear and not specifically alleged, Ms. Saleh responds out of abundance of caution.

**B)    Counts I, II, and VII must be dismissed because Plaintiff fails to state a discriminatory nexus.**

Plaintiff's claim must be dismissed because he puts forward no basis to suggest that Ms. Saleh's alleged offense conduct was motivated by discrimination against his protected characteristics as a Jew or an Israeli. Richards v. NYC Health, 2025 U.S. App. LEXIS 26616 at *4 (2d Cir. 2025) (...the sine qua non of a national origin or race-based discrimination suit is that the discrimination must be because of the plaintiff's protected characteristic.") (internal citations omitted; emphasis in original). Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009) (conclusory and formulaic allegations of discriminatory animus are "not entitled to the assumption of truth" and are insufficient under federal pleading standards).

Plaintiff includes scattered references to political statements suggesting that various criticisms Ms. Saleh has made of Israel are anti-Semitic, with the implication that both her signing of a petition and her complaint against him is discriminatory. Such an allegation may be acceptable on a talk show or a Twitter discussion as part of our nation's ongoing debate about the Israel-Palestine armed

conflict; it has no justification in a court of law.

The most comprehensive evaluation of this issue can be found in the First Circuit's recent opinion in Stand With Us Ctr. L. J. v. MIT, 2025 U.S. App. LEXIS 27390 (1st Cir. Oct. 21 2025); because of its relevance to the merits of Plaintiff's claims, Defendant summarizes the relevant part of the opinion. In that case, Jewish pro-Israel MIT student plaintiffs alleged that in the aftermath of the October 7, 2023 Hamas armed attack on Israel and the ensuing Israeli military escalation, various pro-Palestine students, faculty, or staff at the MIT campus engaged in protests and public statements (i.e. university-wide e-mails, op-eds, etc.) that condemned Israel or supported Palestine.

The allegations about protest activity in MIT are strikingly similar to those in this case, namely, allegations that protesters said that Israel is a racist or colonial country, that Zionism is a form of racism, that Israel is complicit in genocide, and that Israel's subjugation of the Palestinians is white supremacy. The protest activity also included alleged support for Palestinian resistance to Israel, calls for revolution, etc. Some of the alleged protest activity was disruptive or violated the campus' rules, including blocking major thoroughfares, erecting a protest encampment, or posting anti-Israel advocacy materials and leaving them up where posters were prohibited. Some of the protest activity took place near pro-Israel

11

Jewish students' own protest activity in support of Israel, or aimed at office buildings that hosted programs that the protesters condemned as supportive of Israel, causing those inside to feel intimidated.

Amid this protest activity, the plaintiffs also alleged several instances in which the plaintiffs were blocked from moving through certain areas "because [they were] Jewish or Israeli" while permitting others to cross; an instance in which a student protester alleged that one of the plaintiff's ancestors were responsible for Israeli government actions because that plaintiff is Jewish; that a graduate student authored a tweet allegedly suggesting Jews were Nazis; that a group of protesters heckled someone because he was visibly Jewish; and that a guest speaker encouraged students to "confront MIT's Jewish students" at a Jewish pro-Israel organization about Gaza. MIT at *9 and *50.

The plaintiffs alleged that all of these actions taken together created a hostile environment at the MIT campus, where the protest activity generally constituted anti-Semitic discrimination insofar as it was anti-Zionist and "most Jews" see Zionism as "a key component of their Jewish ethnic and ancestral identity". MIT at *27. Those plaintiffs defined speech as "anti-Zionist" if it "oppose[s] Jewish self-determination in the State of Israel," claims Israel is a racist endeavor, holds double standards against Israel, compares Israeli policy to Nazis, portrays Palestinian

12

violence as resistance to colonialism, or puts forward claims that Palestinians should govern or be "free" in all of Palestine. MIT at *27-28. These arguments generally track the ones cited by Plaintiff in this case.

The First Circuit explicity rejected this line of reasoning, holding that most of the protest activity was simply not discriminatory: "Plaintiffs are entitled to their own interpretive lens equating anti-Zionism (as they define it) and antisemitism. But it is another matter altogether to insist that others must be bound by plaintiffs' view." MIT at *28. The Court went on to note that dictionary definitions do not generally define antisemitism to mean anti-Zionism, that there is a lack of any academic consensus that anti-Zionism is anti-Semitism, and that the matter has been subject to high-profile debate.[2] The Court went on to note that the State

---

2    Defendant cites the following materials, some of which are mentioned explicitly by the MIT court at *28-29 (note 14) as elaborating upon this debate: Note, Wielding Antidiscrimination Law to Suppress the Movement for Palestinian Rights, 133 Harv. L. Rev. 1360 (2020) (extensive critique of allegations that boycotts aimed at Israel or Zionism are discriminatory, including where they presume a discriminatory intent rather than properly alleging one, and noting that Israel's human rights record establish a legitimate nondiscriminatory reason for boycotts); Derek Penslar, Who's Afraid of Defining Antisemitism?, 6 Antisemitism Stud. 133 (2022) (discussing various competing definitions of anti-Semitism and noting that the "IHRA definition" – the one Plaintiff and MIT plaintiffs have used – is overbroad and contradictory); Sherene Seikaly, "Anti-Zionism Can and Should Be Anti-Racism," NYT (Apr. 4, 2016) (part of New York Times debate series about whether anti-Zionism is anti-Semitism: "To equate opposition to Zionism with anti-Semitism is to deny the history of both," arguing that Zionism continued rather than opposed Enlightenment-era anti-Semitism and that Palestinian self-determination is a "crucial step in ending

Department's endorsement of anti-Zionism-as-anti-Semitism is not entitled to

deference where it would imply that the government could simply manufacture a

list of topics that are unprotected speech. The Court rejected additional contentions

of anti-Semitic discrimination based on the fact that the protesters specifically

targeted Israel as opposed to other countries or because the protesters accused

the logic of racialization and civilizational hierarchy that produced anti-Semitism"), available at https://www.nytimes.com/roomfordebate/2016/04/04/is-anti-zionism-anti-semitism/anti-zionism-can-and-should-be-anti-racism; Omar Zahzeh, "Zionism Justifies Discrimination and Oppression," NYT (Apr. 4, 2016) (part of New York Times debate series about whether anti-Zionism is anti-Semitism: "Anti-Zionism is a principled anti-racist position," citing discriminatory Israeli laws; "Seeing any criticism of Zionism as anti-Semitism also erases the vibrant history of Jewish debates about the rightfulness of Zionist practice…"), available at https://www.nytimes.com/roomfordebate/2016/04/04/is-anti-zionism-anti-semitism/zionism-justifies-discrimination-and-oppression; Lisa Goldman, "Anti-Zionists Thrive in Israel, Why Not in the U.S.?" NYT (Jan. 16, 2017) (part of New York Times debate series about whether anti-Zionism is anti-Semitism: "In America...openly identifying as a non-Zionist is anathema to Jewish communal life...And yet in Israel...there are secular, native-born Israeli Jews who do not believe in Zionism as a political ideology, or in the idea of a state that is defined as a home for the Jews rather than as a place that treats all citizens equally. Some of these non-Zionist Jews sit in the Knesset [Israeli Parliament]...When Jews conflate criticism of Israel with anti-Semitism, they are stifling legitimate political expression."), available at https://www.nytimes.com/roomfordebate/2016/04/04/is-anti-zionism-anti-semitism/anti-zionists-thrive-in-israel-why-not-in-the-us; Zachary Foster, "The forgotten history of Jewish anti-Zionism," Palestine Nexus (May 13, 2025) (summarizing an extensive history of mainstream Jewish opposition to Zionism and its ebb and flow, contrary to litigants' suggestion that Zionism and Jewishness are synonymous), available at https://palestinenexus.com/articles/jewish-antizionism.

14

Israel of genocide. Finally, the Court noted that if opposition to Israel could constitute anti-Semitic discrimination based on Jewish identification with Israel or Zionism, then the inverse would also be true: that Muslim and Palestinian students could similarly claim that expressing support for Israel would be discriminatory, effectively forcing MIT to shut down all discussion and advocacy, including pro-Israel Jewish students' own, about the topic.

The First Circuit nonetheless acknowledged the instances in which Jewish students alleged being subject to differential treatment because they were Jewish (i.e. selectively impeding the thoroughfare; heckling a visibly Jewish person; equating Jews with Nazis; blaming a Jewish person's ancestors for Israel's actions because they were Jewish; a guest speaker advocating that Jewish students specifically be confronted), and that these instances did constitute discriminatory activity. But because these instances were isolated, those plaintiffs could not properly attribute them to the entire protest movement, drastically undermining the plaintiffs' arguments for sufficient pervasiveness, severity, and notice.

The First Circuit's evaluation closely tracks similar cases, including cases in this circuit, regarding Israel-related speech on university campuses. See, e.g. Gartenberg v. Cooper Union 765 F.Supp 3d 245, 269-271 (N.Y.S.D. Feb. 5, 2025) (Gartenberg I) (demonstrations, chanting, and written advocacy by students or

15

alumni celebrating the Palestinian Intifada, grieving individuals killed by "Israeli occupation and imperial violence," criticizing "the conflation of Zionism and Judaism as 'manipulative, exploitative, and racist," justifying the October 7 Hamas attack, or calling to "RESIST COLONIALISM FROM THE BRONX TO PALESTINE 'BY ANY MEANS NECESSARY'", as well as defendant university requiring all students including Jews to take a class about the "misuses of Holocaust memory" were all "pure speech on matters of public concern" and failed to establish liability without "factual support for [the] assertion that any of these messages were intended to target particular Jewish students"; by contrast, finding as sufficiently probative of possible discriminatory harassment instances of defacement in which "Jews" specifically are identified as colonizers, directing controversial slogans specifically at visibly Jewish students, and using a Nazi-associated typeface for a graffitti slogan); Gartenberg v. Cooper Union, 2025 U.S. Dist. LEXIS 33977 (N.Y.S.D. Feb. 25, 2025) (Gartenberg II) (rejecting reconsideration of Gartenberg I holding that anti-discrimination law "does not reach instances of pure speech by pro-Palestinian members of Cooper Union's community that, as pleaded, were reasonably designed or intended to contribute to an ongoing debate regarding the Israeli-Palestinian conflict"); and Garrett v. CUNY, 2025 U.S. Dist. LEXIS 201916 (N.Y.S.D. Oct. 10, 2025) (citing

16

Gartenberg I and Gartenberg II, distinguishing between pro-Palestinian protest generally and individualized, targeted harassment of Jews in the form of a professor "singling out a Jewish student about how she felt about the genocide in Gaza," a professor asking Jewish plaintiff about his faith, student e-mailing a Jewish professor comparing Jews to "Satan worshippers," swastika graffitti, the alleged refusal to permit a menorah lighting, and other acts that were both unlawful and either directed at or sought to publicly humiliate specific Jewish persons); and Landau v. Corp of Haverford Coll., 2025 U.S. Dist. LEXIS 123300 at *13-14, 16, 26, 44, and 46 (E.D.Pa. June 30, 2025) ("I reject the proposition that criticism of Israel is invariably antisemitic"; rejecting that investigation of Jewish professor was actionable where there were no facts suggesting that he was investigated "because he was Israeli and/or Jewish'"; rejecting contention that protesters' opposition to anyone who supported Israel was actionable discrimination where it was distinct from targeting of Jewish students specifically; distinguishing refusal by professor to write recommendation letters for supporters of Israel from refusal to support Jewish students per se; condemnation of "Zionists" is not clearly aimed at Jews).

This analysis resolves Plaintiff's allegations against Ms. Saleh: where he has put forward no independent, non-conclusory suggestion that Ms. Saleh's public

17

statements about Zionism, Zionists, etc. or her private complaint against him were motivated by racial animus <u>other than</u> his belief that opposition to Israel is an inherent indicator of anti-Semitism, his claims against Ms. Saleh are meritless. Indeed, unlike in <u>MIT</u>, where the plaintiffs at least alleged some activity that was discriminatory but failed to attribute it to the rest of the alleged activity, Plaintiff here asserts <u>no allegation</u> against Ms. Saleh or anyone else of being <u>targeted for being Jewish or Israeli</u>.

The initial claim – signing a petition – simply includes anti-Israel statements, and as there is no mention of Plaintiff in the petition, it can hardly be said to target him at all, let alone for his protected characteristics. It is therefore plainly outside the scope of the consensus described as to what is necessary for alleging a discriminatory nexus. The latter claim – Ms. Saleh's complaint – indicates only that Ms. Saleh accused Plaintiff of "contribut[ing] to publications which wrote false information about [her] based on her ethnicity and religion, and then shared these publications on social media". SAC at ¶ 105. Notably, Plaintiff does not deny contributing to the article in question or allege that Ms. Saleh accused him of the falsehoods. SAC at ¶ 48. Although Plaintiff denies that he personally contributed false information or that the article contains statements about Ms. Saleh's ethnicity, neither of those contentions address whether the article

itself was false, whether the falsehoods were based on her ethnicity or religion, or whether or not he shared the articles. As such, Plaintiff's description of Ms. Saleh's allegations are consistent with his own telling, and fail to allege defamation or public humiliation, let alone a discriminatory nexus.[3]

**C)    Counts I, II, and VII must be dismissed because any application of anti-discrimination law under these circumstances and based on these allegations would violate the First Amendment of the United States Constitution.**

Even if Plaintiff could properly establish that Ms. Saleh's offense conduct was discriminatory, both allegations against her – the petition and her complaint – are protected speech under the First Amendment. Anti-discrimination laws must comply with the Constitution. While speech integral to or incidental to conduct that is subject to regulation can itself be regulated, "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." Saxe v. State College Area Sch. Dist. , 240 F.3d 200, 204 (3d Cir. 2001); see also Volokh v. James, 148 F.4th 71, 88 (2d Cir. 2025) (striking down law that required websites not to permit hateful conduct where "...expression motivated by bias, hatred, or bigotry falls within the First Amendment's protection"); and Rodriguez v. Maricopa Co. Comm. College, 605 F.3d 703 (9th Cir. 2010) (college professor's e-

---

3    C.f. Garrett at *34-35 (suggesting that a public and defamatory article about Jewish plaintiff by pro-Palestine group is possibly indicative of actionable discrimination and not protected by the First Amendment; this case is discussed further in note 4, infra).

mails to faculty list-serv defending Christopher Columbus, arguing the superiority of European society, and challenging non-white immigration were not actionable harassment where complaint was based "entirely on his point of view, and it is axiomatic that the government may not silence speech because the ideas it promotes are thought to be offensive"; where the "right to provoke, offend and shock lies at the core of the First Amendment...particularly so on college campuses;" concluding "[w]e therefore doubt that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment.").

This court need not write on a clean slate: multiple district courts in this circuit have already concluded based on these First Amendment principles that conduct like the kind alleged against Ms. Saleh is protected speech. Gartenberg I at 271 ("The content of the protest slogans, fliers, and other expressions...related to the ongoing Israeli-Palestinian conflict and touched upon topics like Zionism, colonialism, and racism...[plaintiff's] Complaint offers no factual support for its assertion that any of these messages were intended to target particular Jewish students, as opposed to efforts to communicate a political message to the Cooper Union community at large...To the contrary, as described in the Complaint, this expression qualifies as pure speech on matters of public concern because it can be

fairly considered as relating to [a] matter of political, social, or other concern to the community" and was communicated in a manner reasonably calculated to contribute to an ongoing public debate of considerable political significance); Gartenberg II at *13 (reaffirming First Amendment analysis in Gartenberg I: "To construe Title VI's prohibition on discriminatory harassment as sweeping in instances of pure speech that are reasonably designed or intended to contribute to the ongoing public debate concerning the Israeli-Palestinian conflict would "risk the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." (citing Rosenberger v. Rector, 515 U.S. 819, 836 (1995))); Garrett at 21 (adopting First Amendment analysis of Gartenberg); Landau at *9 -16 (lecture criticizing Israel directed at the general public, distribution of Palestinian flags, student group adopting call for "liberation of Palestine through the complete dismantling of the apartheid settler colonial state of Israel", Instagram posts supporting Palestinian armed resistance in response to student's complaints about pro-Palestine commentary, are all pure speech protected by First Amendment and legally inactionable); MIT at *24 (The First Amendment "erects safeguards that limit the ability of the government or private plaintiffs" to punish pro-Palestine demonstrators' protected speech activity).

21

Here, Ms. Saleh's signing of a petition condemning "Zionist tactics" is similarly protected. That Plaintiff claims the petition was aimed at him – despite including no reference to him specifically – changes nothing, where it is, like the protected speech discussed above, little more than public speech on a matter of public concern.

Nor is Ms. Saleh's private complaint entitled to any less protection. To the contrary, where Ms. Saleh's private complaint was pursuant to CUNY's administrative processes for redress and alleged discrimination, it was equally a matter of public concern. See Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979) (teacher who made private complaints about discriminatory employment policies and practices was entitled to First Amendment protection where her complaints were matters of public concern irrespective that it was voiced privately); and Konits v. Valley Stream Cent. High Sch. Dist., 394 F.3d 121 (2d Cir. 2005) (internal grievances as well as a lawsuit alleging discrimination were matters of public concern and entitled to First Amendment protection).[4]

---

4    Defendant notes that in Garrett, discussed supra, the district court found that a student group's public criticism, accusing a Jewish plaintiff of manipulating or fabricating complaints of anti-Semitism against the students, was actionable where it was humiliating and also alleged to be defamatory. Defendant notes that the reasoning behind this claim is confused: the Garrett court appears to acknowledge that public statements of that nature are entitled to protection, and also that there was no basis to suggest that the allegation was itself discriminatory, but nonetheless held that the suggestion of defamation allowed the alleged conduct to be sufficient at the pleading

**D)**     **Counts I, II, and VII must be dismissed because the conduct alleged, even had it been discriminatory and unprotected by the First Amendment, was insufficient to allege actionable harassment.**

Even if Ms. Saleh's petition or complaint against Plaintiff were discriminatory and/or unprotected by the First Amendment, the conduct alleged fails to arise to the level necessary to establish hostility or actionable harassment. Ms. Saleh's petition was not directed at Plaintiff and was a general public statement that was not aimed at Jews or Israelis per se; it does not amount even to a petty slight or trivial inconvenience. To the contrary: public statements of the sort are simply normal behavior at any university campus. Similarly, Ms. Saleh's complaint was a normal part of the process of resolving disputes. Even had Plaintiff been aware of it more than a month before it was dismissed, such conduct cannot be reasonably construed to be any more than an inconvenience. As such, the conduct alleged is not actionable even under the lowest standards for workplace adversity, let alone severity or pervasiveness.

---

stage for actionable discriminatory conduct. Even accepting that the district court did not err in so concluding, the allegation is distinguishable from Ms. Saleh's complaint because A) Ms. Saleh's complaint was not made publicly and B) the allegations put forward by Plaintiff indicate that the allegations against him were not defamatory despite his suggestion otherwise: Plaintiff admits to contributing to the articles in question and does not deny sharing them.

**III)   Plaintiff Fails to State Claims for Retaliation (Counts III, IV, and VIII).**

In addition to alleging that Ms. Saleh subjected him to harassment and/or a hostile work environment, Plaintiff claims that the same exact conduct – signing a petition and filing a complaint against him – constituted unlawful retaliation under Title VII (Count III), the CHRL (IV), and the SHRL (VIII). For the following reasons, these claims must be dismissed.

Under Title VII and the SHRL, a plaintiff bringing claims of retaliation must allege that they participated in activity that was protected; that the defendant knew of the protected activity; engaged in an adverse employment action; and that a causal connection existed between the protected activity and the adverse employment action. See Littlejohn v. City of New York, 795 F.3d 297, 316 (2d Cir. 2015) (citing Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010); see also Schaper v. Bronx Leb. Hosp. Ctr., 408 F.Supp. 3d 379, 390 (S.D.N.Y. 2019) and Kwan v. Andalex Grp., LLC, 737 F.3d 834, 843 (2d Cir. 2013) (applying the same standard to SHRL claims). Under the CHRL, a plaintiff bringing claims of retaliation must allege the same elements except that instead of an adverse employment action, they need only allege that the employer engaged in activity that was reasonably likely to deter a person from engaging in that activity. Leon v. Columbia Univ. Med. Ctr., 2013 U.S. Dist. LEXIS 177728 at *12 (S.D.N.Y. 2013)

(citing statute).

**A)      Count III Must be Dismissed Because Plaintiff Fails to Allege that Ms. Saleh is his Employer.**

As indicated supra in Point II, Title VII applies only to employers. Therefore, any claim under this section alleged against Ms. Saleh must be dismissed. The SHRL and CHRL permit claims against individuals where they are accused of aiding and abetting an impermissible action; while this is far from clear and not specifically alleged, Ms. Saleh responds out of abundance of caution.

**B)      Counts III, IV, and VIII Must Be Dismissed Because Plaintiff Fails to Allege Ms. Saleh's Acts were in Response to Protected Activity.**

Under Title VII, protected activity includes a plaintiff's opposition to a practice that is unlawful under Title VII, or because they "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII," which is in turn limited to "participation in formal EEOC proceeedings" and "does not include participation in an internal employer investigation unrelated to a formal EEOC charge". Littlejohn at 316. The SHRL and CHRL are similar. The relevant portion of the SHRL reads that it is a prohbited practice "for any employer, labor organization or employment agency to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has

25

filed a complaint, testified or assisted in any proceeding under this article." 18 NYS § 296(e)(1) (emphasis added). The relevant portion of the CHRL reads, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or (vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter." NYC Code. § 8-107(7) (emphasis added).

In sum, to state a claim for retaliation under any of the three statutes, a plaintiff must either allege that they opposed conduct that was prohibted by the statute, or that they participated in one of several administrative processes relevant to the enforcement of the law. Plaintiff's allegations against Ms. Saleh – the signing of a petition, purportedly in response to his e-mail complaint to her about the content of poster display, and the filing of a complaint, purportedly based on

26

allegations that he wrote or contributed to an article that she claimed was racist or defamatory – do not qualify. First,  the poster display itself was not prohibited by any of the statutes wherein it was not discriminatory, it was protected by the First Amendment, and it would not qualify as harassment, for the same reasons that the petition itself or the complaint itself do not qualify as discussed in Point II, supra. As such, Plaintiff cannot establish that his complaints to Ms. Saleh directly were in opposition to prohibited conduct; nor can he claim that his contribution to the article condemning the poster display (whatever the nature of his contribution) was "in opposition" either. Hence, insfoar as Ms. Saleh's alleged offense conduct was, on its face, in response to Plaintiff's private complaints and public speech about the poster display, it does not qualify as retaliation. Plaintiff puts forward no alternative, actually discriminatory conduct which he opposed and to which he can allege Ms. Saleh's actions were retaliatory.

Second, Plaintiff fares no better arguing that it was retaliation based on his participation in any of the relevant administrative schemes for investigating discriminatory conduct, because neither his complaint directly to Ms. Saleh and others involved in the SJEC nor his contributions to a pro-Israel publication – the only apparent activities to which Ms. Saleh's offense conduct were allegedly in response to – were in any way related to such administrative proceedings. Insofar

as Plaintiff did file complaints in any such proceeding, he puts forward no basis to suggest that her signing of a petition or her own complaint were in response or even that Ms. Saleh was aware of such proceedings.

**C)     Counts III and VIII Must Be Dismissed Because Plaintiff Fails to Accuse Ms. Saleh of Engaging in an Adverse Employment Action Against Him, and Count IV Must be Dismissed Because Plaintiff Fails to Allege Conduct Likely to Deter a Reasonable Person from Engaging in Protected Activity.**

Plaintiff's retaliation claims must be dismissed because he cannot trace to Ms. Saleh any adverse employment action or other condcut likely to deter a reasonable person from engaging in protected activity. Under Title VII "adverse employment action" means "a materially adverse change in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities," and "a disproportionately heavy workload". Vega v. Hempstead Union Free Sch. Dist, 801 F.3d 72, 85 (2d Cir. 2015). The standard is the same under the SHRL. See, e.g., Reichman v. City of New York, 179 A.D.3d 1115, 1119 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm," (citing Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53 (2006), a Supreme Court case evaluating adverse employment actions

28

under Title VII). The standard is admittedly more liberally construed under the New York City Human Rights Law, which does not require an adverse employment action, but any conduct "reasonably likely to deter" a complaining employee.

Nonetheless, Plaintiff fails to allege the sufficient level of adversity under any statute. Plaintiff cannot allege that Ms. Saleh's acts of signing a petition or complaining – let alone any other acts – constituted or even resulted in any adverse employment action. The only potential adverse employment action Plaintiff cites is his denial for a position that could have led to promotion, but he does not and cannot allege that Ms. Saleh's acts of signing a petition or her complaint or any other act on her part caused this denial, let alone knowingly. Nor are those acts – signing a petition or filing a complaint – themselves adverse employment actions. Hence, his complaints for retaliation fail under Counts III and VIII.

Even with the looser standard for the NYCHRL claims, Plaintiff cannot credibly argue that a petition criticizing his political views – particularly one that does not name him – constitutes an action reasonably likely to deter someone from filing a complaint. Hence, signing the petition was not actionable conduct under the CHRL.

Nor can filing a complaint about Plaintiff be so construed. For one, Plaintiff

admits he did not even know that the complaint had been filed until roughly a month before it was resolved and dismissed. But more importantly, filing a complaint is itself protected activity; to conclude that engaging in protected activity would itself constitute grounds for retaliation would unmake the statutory scheme.[5]

**D)     Counts III, IV, and VIII Must Be Dismissed Because They Are Not Premised on Good Faith, Reasonable Beliefs of Discrimination.**

While a retaliation claimant need not prove that their "underlying complaint of discrimination had merit," they must at least esatablish that it was motivated by a "good faith, reasonable belief that the underlying employment practice was unlawful." Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013) (referring to claims under Title VII, SHRL, and CHRL) (internal citations omitted).

The merits of the underlying complaints involving Ms. Saleh have been discussed at length in Point II. But the claims are not simply meritless; they are frivolous. Plaintiff cannot put forward a good faith belief that Ms. Saleh's challenged actions – signing a petition criticizing the tactics or views of "Zionists"

---

5    Indeed, the reverse may well be true: Plaintiff's claim against Ms. Saleh for filing a complaint is arguably itself an act of retaliation. In Clifton Park Apartments, LLC v. NYSDHR, 2024 N.Y. Slip. Op. 00793 (2024), the New York state high court concluded that threats of litigation against those who make discrimination complaints constitute the requisite adverse action under state anti-discrimination laws.

and filing a complaint about him – were themselves motivated by race or constituted unlawful conduct. Indeed, the only basis Plaintiff puts forward is that they involved condemnation of Israel, and that he or others support Israel, citing advocacy materials from Jewish/pro-Israel organizations (see, e.g. SAC at ¶ 38). Notably, even the drafter of the definition of anti-Semitism which Plaintiff cites rejects its use as a campus speech code or for legal purposes:

> "...I was the lead drafter of what was then called the 'working definition of antisemitism'. It was created primarily so that European data collectors could know what to include and exclude. That way antisemitism coudl be monitored better over time and across borders. It was never intended to be a campus hate speech code...But starting in 2010, rightwing Jewish groups took the 'working definition,' which had some examples about Israel...and decided to weaponize it with Title VI cases. All these cases lost, so then these same groups asked the University of California to adopt the definition and apply it to its campuses. When that failed, they asked Congress, and when those efforts stalled, the president." See Kenneth Stern, "I drafted the definition of antisemitism. Rightwing Jews are weaponizing it," The Guardian (Dec. 13, 2019), available at https://www.theguardian.com/commentisfree/2019/dec/13/antisemitism-executive-order-trump-chilling-effect.

Additionally, this definition would not even apply to some of the conduct alleged, namely the complaint Ms. Saleh filed. As such, if Plaintiff's complaint of discrimination is in good faith rather than simply an effort to punish speech with which he disagrees, it is difficult to discern what a bad faith complaint would be.

**IV)    Plaintiff Fails to State a Claim that Ms. Saleh Failed to Adequately Respond to Allegations of Anti-Semitic or Anti-Israeli Discrimination (Counts I, II, and VII).**

Alongside allegations of hostile environment and retaliation, Plaintiff alleges that Ms. Saleh failed to respond adequately to his allegations of discrimination. A litigant may show fault and causation by an employer for failing to address discriminatory behavior adequately after the issue is brought to their attention. See, e.g. Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 670 (2d Cir. 2012) (for claims under Title VI). But because Plaintiff fails to put forward any merited allegations of discrimination or harassment against Ms. Saleh, or against anyone else whose conduct could be traceable to Ms. Saleh, he cannot prevail on any allegation of inadequate response.

Additionally, the only apparent indication that he had ever shared such an allegation with her is his initial response to the poster display demanding that the SJEC sponsor alternative content about Israel. SAC at ¶ 63. However, Plaintiff once again does not clarify if this is what he is talking about – the allegation is conclusory. Admittedly, the poster display is a distinct factual claim from the subsequent petition about it or Ms. Saleh's complaint about Plaintiff's alleged involvement in an article about it. But for the same reasons, as discussed in Point II, supra, Plaintiff cannot put forward a merited claim of discrimination or

32

harassment based on the content of the poster display anymore than he can about the subsequent petition or the complaint.

Furthermore, where Plaintiff requests specifically that alternative political content be sponsored by Ms. Saleh or others, he is not only not entitled to relief but is affirmatively barred by the Constitution from the kind of relief he requests, because he is seeking to compel political speech. See, e.g. Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, 515 U.S. 557, 572-573 (1995) (barring enforcement of anti-discrimination statute to force inclusion of gay voices in St. Patrick's Day parade over parade organizer's objection because it would impermissibly "alter the expressive content of their parade"); and 303 Creative LLC v. Elenis, 600 U.S. 570, 589 (2023) (barring enforcement of anti-discrimination statute against Christian wedding web designer where it would compel her to endorse gay marriage and holding that any other conclusion would, by the same token, impermissibly allow the government to "force an unwilling Muslim movie director to make a film with a Zionist message"); and Landau at 20-21 ("A court cannot compel administrators' speech, nor insist the administrators should have conveyed a different message" about Hamas' October 7 attack, citing case law against compelled speech). Just as Ms. Saleh is entitled under the First Amendment to condemn Israel's colonial or apartheid violence against

33

Palestinians, she is just as equally entitled not to host or promote content supporting Israel or Plaintiff's views about that country.

**V)    Plaintiff Fails to Allege Discrimination Under the New York City Civil Rights Law (Count IX).**

In another example of shotgun pleading, Plaintiff alleges that "defendants" violated his rights under the New York City Civil Rights Law without specifying Ms. Saleh by name; he nonetheless repeats allegations that mirror the allegations he has made elsewhere against Ms. Saleh: "Defendants discriminated against Plaintiff unfavorably as compared to similarly situated non-Jews and non-Israelis, by, inter alia making public false and defamatory statements about Plaintiff, <u>fabricating complaints, initiating and perpetuating a bad-faith investigations of facially baseless claims against Plaintiff</u>, and refusing to appoint him to the Advisory Council on Jewish Life." SAC at ¶ 260 (emphasis added). Plaintiff makes additional conclusory allegations that this treatment was discriminatory and/or deliberately indifferent and that this treatment constituted the creation of a hostile environment. SAC at ¶¶ 261-262.

As Plaintiff's allegation is essentially redundant of his prior allegations of hostile environment and discrimination, and no case law indicates that the Civil Rights Law permits findings of liability in circumstances where the CHRL, SHRL, and Title VII do not, Defendant will not belabor the point and simply refer the

Court to Point II and Point IV in support of dismissing this claim for the same reasons. Additionally, as indicated, Plaintiff's allegations of discriminatory intent remain conclusory and devoid of substantiation.

**VI)    Plaintiff Fails to State Claims under the Fourteenth Amendment Against Ms. Saleh (Counts V & VI).**

In yet another example of shotgun pleading, Ms. Saleh is not identified specifically as the relevant defendant in Counts V and VI. But the relevant defendants are not identified at all, and Ms. Saleh is named as the initiator of a complaint that, says Plaintiff, should have been investigated and resolved more quickly in respect for his rights to Due Process (Count V) and Equal Protection (Count VI) under the Fourteenth Amendment. Plaintiff brings these claims under 42 U.S.C. § 1983. These claims are meritless. While it is unclear whether Plaintiff is alleging these claims against Ms. Saleh where he has failed to identify clearly which defendants it is brought against, Defendant responds out of abundance of caution (again).

First, these claims are not properly brought against Ms. Saleh because Plaintiff fails to put forward any basis, let alone a non-conclusory one to suggest that Ms. Saleh was in any way involved in the investigation of her own complaint or caused any delay. Hence, even if this claim had any legal merit, it is not properly brought against Ms. Saleh.

Second, Ms. Saleh is arguably not subject to this claim as it is a § 1983 claim, which is limited to individuals acting under color of state law. See 42 U.S.C. § 1983, and Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004). It is "axiomatic" that "under 'color' of law means under 'pretense' of law and that 'acts of officers in the ambit of their personal pursuits are plainly excluded." Pitchell v. Callan, 13 F.3d 545, 547-548 (2d Cir. 1994) (citing Screws v. United States, 325 U.S. 91 (1945)). All allegations made against Ms. Saleh – her signing of the petition and her pursuit of a complaint process – took place in her personal capacity as a graduate student and educator; she did nothing pursuant to any authority granted to her to enforce laws, which she does not have.[6]

Furthermore, both claims are meritless. Insofar as Plaintiff alleges that the there was a delay in the resolution of Ms. Saleh's complaint that was the result of disparate treatment (Count VI under the Equal Protection Clause), Plaintiff puts forward only the conclusory claim that he was treated differently because of his identity. Such an allegation does not meet the relevant pleading standards; any attempt to compensate for this insufficiency by citing criticisms of Israel are not only substantively meritless for reasons already discussed at length, but also fail to

---

6    Additionally, even if Ms. Saleh were acting under color of law, she would be entitled to qualified immunity where Plaintiff does not allege any unlawful violation of his rights against her, let alone a violation that was "clearly established" at the time.  See Ashcroft v. al-Kidd, 563 U.S. 731 (2011).

36

establish causation. See Iqbal at 680-681.

Insofar as his delay-related claim implies that the delay was inherently improper and warrants relief under the Procedural Due Process Clause (Claim V), the claim is devoid of substance. Plaintiff does not identify any adverse consequences that would warrant relief under the Due Process clause, such as the confiscation of property in the form of the loss of his job. See, e.g. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985). Additionally, it is equally conclusory: there is no indication that the complaint was not resolved in the normal time necessary. See, e.g. Isaacs v. Bowen, 865 F.2d 468, 477 (2d Cir. 1989) (delay is regrettably normal; delays of the length here are normal for processing various administrative claims). By all indications in his complaint, he received all process to which he is entitled.

## CONCLUSION

Plaintiff's complaint should be dismissed.

Respectfully submitted this 30th Day of October, 2025.


/s/ Amith Gupta, Esq.
NY Bar Reg. # 5599139
American Trial Law Litigators, LLC
925B Peachtree St. NE #2151
Atlanta, GA 30309
(408) 355-5782
amithrgupta@gmail.com
Attorney for Defendant Nadia A. Saleh


Jonathan Wallace
PO #728
Amagansett NY 11930
(917) 359-6234
jonathan.wallace80@gmail.com
Attorney for Defendant Nadia A. Saleh

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing

MOTION TO DISMISS to the Clerk of Court and all counsel of record via the

ECF system.

This 30th Day of October, 2025.

 /s/ Amith Gupta, Esq.
NY Bar Reg. # 5599139
American Trial Law Litigators, LLC
925B Peachtree St. NE #2151
Atlanta, GA 30309
(408) 355-5782
amithrgupta@gmail.com
Attorney for Defendant Nadia A. Saleh