**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Avraham Goldstein ) | |
| ) | |
|    Plaintiff, ) | |
| ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| City University of New York, ) | Civil Action Case No. 1:25-cv-475 |
| ) | |
| Borough of Manhattan Community College, City ) | |
| University of New York, Tammie N. Velasquez, ) | |
| Nadia A. Saleh, Theresa B. Wade, ) | |
| Odelia Levy, Saly Abd Alla, and Félix V. Matos ) | |
| Rodríguez. ) | |
| ) | |
|    Defendants. | |

~~SECOND~~ **THIRD AMENDED COMPLAINT FOR DAMAGES AND JURY DEMAND**

COMES NOW Avraham Goldstein ("Plaintiff"), by and through his attorneys working with the National Jewish Advocacy Center, Inc., and alleges the following against Borough of Manhattan Community College and the City University of New York, Tammie N. Velasquez, Nadia A. Saleh, Theresa B. Wade, Odelia Levy, Saly Abd Alla, and Félix V. Matos Rodriguez (collectively, "Defendants"):

**PARTIES**

1.    Plaintiff, Avraham Goldstein is an employee of Defendants residing in New York, New York.

2.    City University of New York (CUNY) is a public university system organized under the laws of the State of New York, with its principal place of business at 205 East 42nd Street, New York, NY 10017. CUNY oversees 25 campuses, employs over 30,000 individuals, and transacts business throughout the City and State of New York by providing higher education services and employing faculty, administrative staff, and other personnel.

3.    CUNY has at all relevant times been an "employer" covered by Title VII of the Civil Rights Act of 1964, NYLL §740, the New York State Human Rights Law (NYSHRL), and

1

Formatted: Indent: First line: 0", Right: 0", Space Before: 13.8 pt, Line spacing: single

the New York City Human Rights Law (NYCHRL).

4.      Borough of Manhattan Community College (BMCC) is a public institution and a constituent college of CUNY, organized under the laws of the State of New York, with its principal place of business at 199 Chambers Street, New York, NY 10007. BMCC employs over 1,000 employees and transacts business in New York County by providing higher education services and employing faculty, administrative staff, and other personnel.

5.      BMCC has at all relevant times been an "employer" covered by Title VII of the Civil Rights Act of 1964, NYLL §740, the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL).

6.      Defendant Tammie N. Velasquez was at all relevant times an employee of Defendants and Director of Defendant BMCC's Women's Resource Center, though its "Social Justice and Equity Center" (SJEC).

7.      Defendant Nadia A. Saleh was at all relevant times an employee of Defendants, and Defendant BMCC Coordinator of its Multi Cultural Center, one of the SJEC centers.

8.      Defendant Theresa B. Wade was at all relevant times an employee of Defendants, and Defendant BMCC's Office of Compliance and Diversity Deputy Director of Diversity and Title IX Compliance.

9.      Defendant Odelia Levy was at all relevant times an employee of Defendants, and Defendant BMCC's Chief Diversity Officer.

10.      Defendant Saly Abd-Alla was at all relevant times an employee of Defendant CUNY, and was Defendant CUNY's Central Office Chief Diversity Officer and Title IX Coordinator.

11.      Defendant Félix V. Matos Rodríguez was at all relevant times an employee of Defendant CUNY and was CUNY's Chancellor.

> **Formatted:** Font: Not Bold

## JURISDICTION AND VENUE

12.      Jurisdiction is founded upon 28 U.S.C. § 1331 and principles of supplemental

jurisdiction under 28 U.S.C. §1367.

13.    Plaintiff filed a Charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Right to Sue letter dated October 18, 2024.  Accordingly, this lawsuit is timely.

14.    Plaintiff did not file with the New York State Division on Human Rights or City Commission on Human Rights, and accordingly jurisdiction for NYCHRL claims rests with this Court pursuant to the New York City Admin. Code §8-502(a).

15.    Within ten (10) days of commencing this lawsuit, Plaintiff shall serve true and correct copies of this Complaint upon designated representatives for the New York City Commission on Human Rights and Corporation Counsel pursuant to New York City Admin. Code §8-502(c).

16.    The New York City Human Rights Law claims herein were filed within three (3) years of the alleged unlawful discriminatory practice and/or harassment and thus areis timely within the statute of limitations.

17.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because Defendants are subject to the court's personal jurisdiction within the Southern District of New York with respect to this action.

**EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES**

18.    Plaintiff has alleged claims of discrimination and retaliation pursuant to Title VII with the EEOC.

19.    Plaintiff has received his Notice of Right to Sue letter dated October 18, 2024, from the EEOC regarding his complaints of discrimination/retaliation for the alleged Title VII claims herein within ninety (90) days of the filing of this Complaint.

4

**NATURE OF ACTION**

20.     This is an action for declaratory and injunctive relief, as well as compensatory and punitive damages, arising from Defendants' violations of Title VII of the Civil Rights Act of 1964, as amended, the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law (NYCHRL).

21.     Defendants engaged in discriminatory and retaliatory practices by posting false and defamatory reviews online, conducting a retaliatory investigation based on patently false allegations against Plaintiff, while failing to adequately investigate Plaintiff's own complaints of discriminatory and hostile treatment, thereby applying discriminatory standards for investigation and perpetuating a hostile work environment.

22.     Defendants actions, including but not limited to failing to adequately investigate Plaintiff's complaints of discrimination, launching and perpetuating a ~~fifteen month~~fifteen-month investigation of facially baseless claims, posting false and defamatory reviews online, failing to provide

Plaintiff with due process during the investigative process, denying Plaintiff's application to be appointed to a university committee, and allowing discriminatory treatment to persist, were motivated by Plaintiff's protected characteristics and/or in retaliation for Plaintiff's opposition to discriminatory practices.

23.     Defendants' disparate treatment of Plaintiff in posting false and defamatory online reviews, and in how investigations were handled, reflects a pattern of discrimination that created and reinforced a hostile work environment, undermined Plaintiff's professional standing, and violated Plaintiff's rights under federal, New York State, and New York City anti-discrimination laws.

5

24.    Upon information and belief, at all pertinent times, Defendants acted or failed to

act by and through their duly authorized agents, servants, representatives, partners, managers, supervisors and employees, who conducted themselves within the scope and course of their employment, with intentional malice and/or with reckless disregard to Plaintiff's federal, New York State and New York City statutory rights.

25.     As a result of Defendants' unlawful actions, Plaintiff has suffered emotional distress, reputational harm, and damage to professional opportunities, in addition to economic losses.

26.     Plaintiff seeks relief to remedy the ongoing harm caused by Defendants' conduct, including equitable relief to prevent further violations, reinstatement of Plaintiff's professional standing, and monetary damages to compensate for harm suffered.

**THE FACTS**
**Background**

27.     Plaintiff has been employed by Defendants BMCC and CUNY as an Assistant Professor in the BMCC CUNY Mathematics Department since in or about 2006.

27.28.  At all times during the course of his employment by Defendants BMCC and CUNY, Plaintiff has performed his services competently, faithfully, diligently, and in an outstanding manner.

29.     Plaintiff is Jewish by ethnicity and religion.

28.30.  Plaintiff is an observant Jew, also known as an Orthodox Jew. Such an identity typically entails engaging in various Jewish religious practices and beliefs such as: the observance of kosher-dietary laws; the observance of the Jewish Sabbath from Friday evening to Saturday evening; and the wearing of clothing or accessories that outwardly identify a person as being Jewish. This is by no means an exhaustive list.

29.31.  Plaintiff is Israeli by Nationality and citizenship.

30.32.  Plaintiff is a Zionist by dint of his religion and his national origin.

7

33.    Zionism is the movement for the re-establishment, and now the development and protection, of a sovereign Jewish nation in its ancestral homeland. Zionism is not just a political movement; for the vast majority of Jewish people across time and space, including Plaintiff, Zionism is and always has been an integral part of their Jewish, often religious, identities.

34.    The Jewish people originated in the Middle East and established their homeland in what is termed in the Bible as the Land of Israel, where for over 1,400 years they lived either as a sovereign nation, in the united kingdoms of Israel and Judah (hence the term, "Jew") or, at times, a nation under occupation by foreign empires. The City of Jerusalem, also called "Zion" in the Bible, was its capital.

35.    In approximately 70 C.E., the Roman empire conquered the Jewish nation, destroyed the Jewish Temple in Jerusalem, and enslaved large numbers of Jews from the Land of Israel and transported them all over the Roman Empire.

36.    In 136 C.E., the Roman empire defeated the final Jewish rebellion and exiled almost all of the remaining Jews from the Land of Israel, where they lived in Diaspora as stateless and often persecuted refugees, forcibly evicted from country to country, earning the moniker, "the wandering Jew".

37.    The Roman conquerors, in an attempt to wipe out the memory of Jewish sovereignty, renamed Israel and Judah "Palestine."

38.    The Land of Israel continued to be governed by foreign empires, most recently by the Ottoman Empire based in Turkey beginning in approximately the 16th Century.

39.    While a minority of Jews remained in the Land of Israel across the millennia

8

even after the Roman exile, with the rise of national political self-determination across the world in the 1800's, Jews began returning from the Diaspora around the world to the Land of Israel in increasing numbers, purchasing or renting land subject to the Turkish Ottoman empire, with the hope of someday re-gaining Jewish political self-determination, commonly called Zionism

40.    In 1918, Turkey was defeated in World War I after allying itself with Germany, and Britain was given a mandate to govern Palestine, the site of the biblical Land of Israel. During this time, Jews continued returning to the Land of Israel, purchasing or renting land and housing.

41.    By the 1940's, Jews were the majority population in a significant portion of the Land of Israel.

42.    In 1947, the United Nations ("UN") General Assembly voted to end the British Mandate by partitioning Palestine, the site of the biblical Land of Israel, into two states: a re-establishment of a sovereign Jewish state in that portion of the Land of Israel in which the Jewish population was the majority, and the establishment, for the first time in history, of an independent Arab state in the portion of the Land of Israel where the Arab population was the majority ("United Nations partition plan"). This is despite that fact that no independent state ever existed within Biblical Israel until that time, as Arab settlement in Israel took place exclusively when the land was under occupation by foreign powers.

43.    The Jewish leadership in the Land of Israel accepted the United Nations partition plan, and on May 14, 1948, declared the establishment of the Jewish State of Israel in the portion of the land allotted to it by the UN resolution.

44.    Arab leadership rejected the United Nations partition plan, rejected Jewish self-

9

determination, declared war, and vowed to drive all the Jews into the sea.

45.    The Jewish state of Israel survived that war and is now in its eighth decade.

46.    In the 1948 war, the neighboring countries of Egypt and Jordan conquered most of the land allotted in the 1947 U.N. resolution to the future independent Arab state, but- did not establish an independent Arab state in those areas.

31.

32.47.  For thousands of years, Jews across the world, including Plaintiff, have prayed to God at least three times a day for a safe return to Zion. The Pentateuch itself references this ancient Jewish hope while the Prophets and Writings repeatedly record this ambition. Over half of the biblical commandments are specifically tied to Israel, and belief in/hope for the return to

10

**Formatted:** Font: 12 pt, Font color: Custom Color(RGB(35,31,32))

**Formatted:** Justified, Indent: Left:  0.51", First line:  0.5", Right:  0", Line spacing:  single,  No bullets or numbering, Tab stops: Not at  1.56"

**Formatted:** Font: 12 pt, Font color: Custom Color(RGB(35,31,32))

**Formatted:** Justified, Indent: Left:  0.51", First line:  0.5", Right:  0", Line spacing:  single,  No bullets or numbering, Tab stops: Not at  1.56"

Zion is part of the 13 Principles of Jewish Faith.


**Defendants Host Discriminatory, Antisemitic Poster Display**

33.48.  On or about March 15, 2023, Defendants hosted a large poster exhibit on the third floor of BMCC's Main Building in front of Defendants' Office of the Vice President of Student Affairs and Defendants' Women's Resource Center.

34.49.  Defendants' Women's Resource Center, though its "Social Justice and Equity Center" (SJEC) sponsored this poster exhibit.

35.50.  In March 2023, Defendant Tammie Velasquez was the Director of Women's Resource Center and the Project Lead of SJEC.

36.51.  In March 2023, Defendant Naidia A. Salech was the Coordinator of the Multi Cultural Center, one of the SJEC centers.

37.52.  The exhibit contained false and defamatory antisemitic statements.

38.53.  Contemporary examples of antisemitism in the workplace include denying the Jewish people their right to self-determination, for example, by claiming that the existence of the State of Israel is a racist endeavor. *See* International Holocaust Remembrance Alliance ("IHRA"), Working       definition       of       antisemitism. (https://holocaustremembrance.com/resources/working-definition-antisemitism,   last visited July 31, 2025).


39.54.  For example, the posters falsely and antisemitically labeled Israel a "colonialist" state, a patently false aspersion because Jews have

no other state from which they could launch a "colony," and thereby antisemitically denied Jewish

11

people, including Plaintiff, their right to self-determination.

40.55.  Defendants' poster exhibit was one part of a three-part program, titled the "Palestinian Solidarity Series."

41.56.  This three-part program also includeding a lecture on or about March 7, 2023, by anti-Israel activist Maryam Shuaib, who led a discussion on what was falsely and antisemitically described as "the structure of apartheid."

42.57.  This program also included a screening of the anti-Israel film *Farha*.

58.    Defendants offered students co-curricular transcript credit (CCT) for attending the Farha film screening.

59.    The invidious false and defamatory comments against Jews and Israelis in Plaintiff's protected group violated    Defendant CUNY's Equal Opportunity and Non-Discrimination policy ("EOND policy").

60.    Defendant CUNY does not allow invidious false and defamatory comments against non-Jewish protected groups to be included in university sponsored programs.

43.

**Plaintiff Opposes Defendants' Unlawful Discrimination**

44.61.  On or about March 15, 2023, Plaintiff and fellow Jewish BMCC professor Jenna Hirsch publicly opposed Defendants' antisemitic and discriminatory exhibit by notifying news media about it and by forwarding photos of Defendants' antisemitic exhibit to the S.A.F.E. CUNY X account

45.62.  On or about March 16, 2023, *UnitedWithIsrael* published an article about Defendants' antisemitic program, entitled "'Horrifying, Antisemitic, Campus-Sponsored' Programs at CUNY; Students Get College Credit for Participating," by Atara Beck.

46.63.  Plaintiff identifies himself in the article as a director of S.A.F.E. CUNY.

47.64.  The article describes S.A.F.E. CUNY as a non-governmental and nonprofit organization that advocates for Zionist Jews systemically discriminated against and excluded at CUNY.

48.65.  Plaintiff is quoted in the article, discussing that the discriminatory and upsetting nature of Defendants' antisemitic exhibits and events, and how he felt that they created an unsafe environment for Jewish students and faculty.

49.66.  Plaintiff's remarks in the article are denoted by quotation marks.

14

50.67.  Plaintiff is not the only person quoted in the article.

51.68.  The article identifies Nadia Saleh as BMCC's SJEC Program Coordinator.

52.69.  The article refers to Nadia Saleh as an anti-Israel activist.

53.70.  The article includes a "tweet" from an account under the name Nadia Saleh of a photo and quote attributed to **Denis McDonough** [President Obama's 2013-2017] White House Chief of Staff.

54.71.  The article does not attribute to Plaintiff – or anyone else - the identification of Nadia Saleh as the SJEC Program Coordinator.

55.72.  At the time the *UnitedWithIsrael* article was published, Defendants' public website identified Nadia Saleh as its SJEC Program Coordinator.

56.73.  The article does not attribute to Plaintiff – or anyone else – the description of Nadia Saleh as an anti-Israel activist.

57.74.  The article does not attribute to Plaintiff Nadia Saleh's alleged dissemination of the "tweet" of the photo and quote attributed to **Denis McDonough,** [President Obama's 2013-2017] White House Chief of Staff.

58.75.  At the time Plaintiff was interviewed for *UnitedWithIsrael's* March 16, 2023 article, Plaintiff and Nadia Saleh did not know each other.

59.76.  At the time Plaintiff was interviewed for *UnitedWithIsrael's* March 16, 2023 article, he was not a subscriber to Nadia Saleh's alleged twitter feed that contained the photo and quote attributed to [President Obama's 2013-2017] White House Chief of Staff Denis McDonogh.

60.77.  At the time that Plaintiff was interviewed by *UnitedWithIsrael*, he was not aware of Nadia Saleh's alleged involvement in Defendants' discriminatory antisemitic exhibit.

61.78.  Plaintiff did not provide to *UnitedWithIsrael* Naida Saleh's alleged "tweet" of the photo and quote attributed to **Denis McDonough,** White House Chief of Staff.

15

62.79.  Plaintiff did not make any statements at all about Nadia Saleh to *UnitedWithIsrael*.

**Plaintiff Asks Defendants to Provide Anti-Discrimination Education on Jewish Indigeneity in Israel**

63.80.  On or about March 21, 2023, Plaintiff on behalf of himself and fellow Jewish BMCC professor Jenna Hirsch emailed every person listed on Defendants' BMCC SJEC website, including but not limited to Defendants Velasquez and Saleh, asking that it sponsor anti-discrimination education on Jewish Indigeneity

in Israel.

64.81.  Defendants' BMCC SJEC website suggests that responses are guaranteed if submitted at least two weeks in advance because it states that responses cannot be guaranteed to be acted upon if sent less than 14 days in advance.

65.82.  Defendants BMCC SJEC, including but not limited to Defendants Velasquez and Saleh, have not responded to Plaintiff's request for anti- discrimination education as of the date of this complaint.

**Plaintiff is Retaliatorily, Falsely, Publicly Defamed**

66.83.  The next day, on March 22, 2023, false and defamatory reviews accusing Plaintiff and Professor Hirsch of racism against Muslims and Palestinians appeared on RateMyProfessor.com.

67.84.  The false and defamatory reviews referenced non-existent courses that Plaintiff does not teach or had not taught in the prior decade.

68.85.  Prior to that day, Plaintiff, over the course of nearly two decades of teaching at Defendants' college campuses, had never been accused of being a racist.

69.86.  Plaintiff is not a racist and has never engaged in racism against Muslims,

16

Palestinians, or anyone else.

**Plaintiff Complains to Defendants about Retaliatory, Public, False Defamation and Demands Investigation**

87.    On or about March 26, 2023, Plaintiff ~~wrote~~ emailed Defendant Rodriguez and Defendant BMCC's President Munroe, copying ~~and~~ Defendant BMCC's Chief Diversity Officer Levy, requesting immediate investigation into the retaliatory, public false defamation, noting that the March 22, 2023 false and defamatory reviews were posted exactly one day after Plaintiff's March 21, 2023 request to Defendants' BMCC Social Justice and Equity Center (SJEC) to provide anti-discrimination education on Jewish Indigeneity in Israel.

88.    The following day, Defendant BMCC's Deputy Director of Diversity, Defendant Theresa Wade, emailed Plaintiff that his concerns were referred to her office.

~~70.~~89.  On information and belief, Defendant Levy was the supervisor of Defendant Wade, because Defendant Levy was BMCC "Chief" Diversity Officer and Defendant Wade was BMCC "Deputy" Director of Diversity.

~~71.~~90.  On or about April 4, 2023, Plaintiff met with ~~Defendants' BMCC Office of Compliance and Diversity Deputy Director of Diversity and Title IX Compliance,~~ Defendant ~~Theresa~~ Wade.

~~72.~~91.  During the meeting, Defendant Wade asked if Plaintiff suspected specific individuals may be responsible for the reviews. Plaintiff reiterated the suspicious timing of the false and defamatory reviews following precisely one day after Plaintiff privately asked Defendants BMCC SJEC to sponsor anti-discrimination education on Jewish indigeneity in Israel, and suggested investigating the BMCC SJEC staff, as indicated in Plaintiff's March 26, 2023 complaint.

~~73.~~92.  Defendant Wade assured Plaintiff that the matter would be investigated, promising an update within two to three weeks.

**Defendants Leak Plaintiff's Complaint Against SJEC Staff and It is Publicly Vilified**

18

**Formatted:** Not Expanded by / Condensed by

74.93.  On or about April 17, 2023, online posts called on the CUNY community to "Stand Against Zionist Repression at CUNY" and decried "[t]he attack launched against social justice education officers at BMCC following their efforts to educate the student body."

75.94.  On or about April 24, 2023, Plaintiff emailed Defendant Wade for updates on the investigation and was informed it was under review, with a promise of follow-up.

19

95. On or about June 9, 2023, over two months after Plaintiff complained to Defendants about the retaliatory false, defamatory and discriminatory statements about him on RateMyProfessor.com and demanded an investigation, Defendants' Office of Compliance and Diversity informed Plaintiff that no individuals had been interviewed.

76.

77.96. CUNY bylaws state, "While some complaints may require extensive investigation, whenever possible, the investigation of a complaint should be completed within sixty (60) calendar days of the receipt of the complaint." *See* Complaint Procedures Under The City University Of New York's Policy On Equal Opportunity And Nondiscrimination, at 4. (*https://www.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/hr/policies-and-procedures/PEONon-Discrimination12.4.2014.pdf*).)

**Defendants' BMCC SJEC Sponsors and Defendant Saleh Signs Retaliatory, Antisemitic Petition**

78.97. On or about April 28, 2023, Defendants' BMCC SJEC Multi-Cultural Center College endorsed a retaliatory antisemitic online petition, describing Plaintiffs' opposition to Defendant's discriminatory, antisemitic poster display as a "Zionist tactic".

98. The petition stated that the BMCC SJEC display was intended to educate the community regarding the "theft" of Palestinian land.

79.99. Defendant Saleh also individually signed this retaliatory online petition.

80.100. A contemporary example of antisemitism in the workplace is applying double standards by requiring of Israel a behavior not expected or demanded of any other democratic nation. *See* International Holocaust Remembrance AllianceIHRA, Working definition of antisemitism.

(https://holocaustremembrance.com/resources/working-

definition-antisemitism, last visited July 31, 2025).

81.101. The online petition antisemitically denies Jewish self-determination, describing the March 2023

poster exhibit as "the history of "Zionist settler colonial rule."

82.102. The online petition antisemitically requires of Israel behavior not expected or demanded of any

21

other democratic nation, describing the 1948 war declared by surrounding Arab states, all of which rejected the United Nations General Assembly two-state partition plan, which Israel accepted, as "the ethnic cleansing, sexual assault, and mass murder, of 750,000+ Palestinians…by Zionist militias."

83. 103. The online petition describes Plaintiff's request for anti-discrimination education on Jewish indigeneity in Israel asin the following manner: "Zionist groups on and off campus are now calling to host their own series of events on Zionism as part of an "intimidation tactic."

**Plaintiff Complains to Defendants about their Retaliatory, Discriminatory Petition**

84. 104. On or about May 5 and May 17, 2023, Plaintiff complained to Defendants about the retaliatory, discriminatory, antisemitic petition sponsored by Defendants' BMCC SJEC, and individually signed by Defendant Saleh.

85. 105. On or about June 9, 2023, Defendants' Office of Compliance and Diversity informed Plaintiff that no individuals had been interviewed in connection with Plaintiff's complaint about the discriminatory, antisemitic petition sponsored and signed by Defendants' BMCC SJEC.

**Plaintiff Requests Appointment to Defendants' Advisory Council**

86. 106. On or about May 11, 2023, Defendant CUNY announced the formation of an Advisory Council on Jewish Life, in the face of numerous sustained complaints of systemic antisemitism at Defendants' campuses.

107.   On or about May 11, 2023, SAFE CUNY asked Defendant CUNY's Chancellor Rodriguez to appoint members of SAFE CUNY to Defendants' newly announced Advisory Council on Jewish Life.

108.   Defendants were aware on May 11, 2023 that Plaintiff was a SAFE CUNY

22

member.

87.

88. 109. In addition, oOn information and belief, a CUNY constituent college Department Chairperson

recommended to Defendant Chancellor Rodriguez the nomination of Plaintiff to the Advisory

**Formatted:** Indent: Left: 1.01", No bullets or numbering

23

Council on Jewish Life.

110.   On September 13, 2023, Plaintiff and seven other named Jewish victims of antisemitism and retaliation at CUNY complained in writing to Defendant CUNY's Office of Recruitment and Diversity ("ORD"), copying Defendant Rodriguez, that Defendant Rodriguez had deliberately excluded Plaintiff and the other Jewish victims of antisemitism from appointment to the Advisory Council on Jewish Life in retaliation for pursuing antisemitism discrimination complaints against CUNY, and asked Defendant CUNY ORD to investigate this complaint of retaliatory exclusion from this committee.

111.   Plaintiff was and is more qualified to serve on Defendants' Advisory Council on Jewish Life committee than many other members of the committee, among other reasons, by dint of the fact that he is a full-time tenured Associate Professor at BMCC, CUNY's largest community college, because he supports the re-establishment of the Jewish state in the Jewish people's ancestral homeland, because he has opposed Defendants' false and defamatory antisemitic statements and actions, and because he has experienced retaliatory false and defamatory public and internal claims that he is a racist.

112.   Defendants' appointed members to the Advisory Council on Jewish Life include many individuals who are demonstrably less qualified than Plaintiff, because they hold lower level positions at CUNY, and support antisemitic statements or persons opposing the existence of the Jewish State of Israel, including:

• Jonathan Epstein, Adjunct Associate Professor, which is a lower position than a full-time tenured Associate Professor such as Plaintiff. An Adjunct Associate Professor is a part-time, non-tenured contract teacher whose full-time employment is elsewhere (if

anywhere).

- Ilya Bratman, who signed a May 2021 antisemitic petition which stated that the Zionist movement was shaped by "settler colonial" paradigms, which contributed to unjust "Jewish supremacy" systems. See https://israelpalestinejs.weebly.com; *https://web.archive.org/web/20221208035339/https://israelpalestinejs.weebly.com/sig natories.htm.*

- Noam Gilboard, who supported Defendants' appointment of Defendant Saly Abd-Alla, prior Civil Rights Director of the Council on American-Islamic Relations, Minnesota (CAIR-MN) during the time period that CAIR-MN called for boycotting, divesting from and sanctioning Israel, which antisemitically applies double standards by requiring of Israel a behavior not expected or demanded of any other democratic nation, to a CUNY role responsible for investigation and training regarding antisemitism.

- David Brodsky, who has publicly stated that Zionism can devolve into "settler colonialism," and who, after the CUNY faculty union was going to vote on condemnation of Israel, and to boycott it, said that Jews should not be able to resign from the union.

89.113. As of the date of the filing of this complaint, Defendants have not appointed Plaintiff to their~~its~~ Advisory Council on Jewish Life.

90.114. Plaintiff's service on the Advisory Council on Jewish Life would constitute university service ~~and would constitute university service~~ and thereby contribute to Plaintiff's promotion to Associate Professor, per Defendant's written policies and procedures. See BMCC

25

CUNY College-Wide Personnel and Budget Committee Policies and Procedures Guidelines https://bmccprodstroac.blob.core.windows.net/uploads/ported/faculty-affairs/upload/budget-guidelines.pdf, at page 11 of 28, II.B.2 ("In cases of … promotions, the chairperson will include a summary of the … annual evaluation. The Annual Evaluation Conference Report should be a summary of a discussion that included ….B. ADMINISTRATIVE ASSIGNMENTS AND SERVICE …. 2. College/University - What are his/her specific contributions to the college/university? Include here references to administrative activities, committee participation, reassigned time and other activities beneficial to the college/university.")

91. 115. On information and belief, promotions normally result in increased compensation.

116.    Defendants, by refusing to appoint Plaintiff to the Advisory Council on Jewish Life, have excluded him from an opportunity, professional development, and visibility that affects his advancement and compensation.

92. 117. Defendants discriminated against Plaintiff on the basis of his Jewish religion and ethnicity and Israeli national origin, and in retaliation for his complaints of Defendants' antisemitism, when they refused to appoint him to the Advisory Council for Jewish Life.

93. 118. On information and belief, as of the date of the filing of this complaint, Defendants have not appointed any member of SAFE CUNY to their Advisory Council on Jewish Life.

**Plaintiff Submits Complaint of Antisemitic Discrimination to Defendants' University-Wide Online Portal**

94. 119. On or about, June 4, 2023, Plaintiff filed a complaint of antisemitic discrimination through

Defendant CUNY's online "portal" (Portal), referencing Defendants' March 15, 2023 antisemitic poster exhibit, the false, defamatory and retaliatory RateMyProfessor posts, Plaintiffs' unanswered request for anti-discrimination education on Jewish Indigeneity in Israel, and Defendants' April 28, 2023 antisemitic online petition.

120.    Upon information and belief, on June 4, 2023, Defendant CUNY's online portal was run by ~~its Title IX Coordinator~~ Defendant ~~Saly Abd~~ A b d - Alla. https://www1.cuny.edu/sites/title-ix/?post_type=campus_profile&p=58

121.    Defendant Abd-Alla in her role as Defendant CUNY"s Central Office Chief Diversity Officer and Title IX Coordinator investigates complaints of antisemitism against executive staff at its constituent community colleges.

122.    Defendant Abd-Alla was the primary trainer of DEI at each of CUNY's 25 constituent colleges.

123.    Defendant Rodriguez was Chancellor when CUNY hired Abd-Alla in or about 2021, and thus was responsible for CUNY hiring her,  and on information and belief, Abd-Alla, as a CUNY Central Office executive, reports to Defendant Rodriguez.

124.    On or about July 15, 2023, U.S. Representative Elise Stefaniak questioned Defendant Rodrigeuz about why he hired and continued to employ Abd-Alla as CUNY's Chief Diversity Officer when she was previously CAIR-MN Civil Rights Director, when CAIR was an unindicted co-conspirator in a terrorist financing trial and had ties to Hamas.

125.    In response, Defendant Rodriguez falsely testified that Abd-Alla did not have responsibility for investigating discrimination claims involving faculty, when documentary evidence proves that she does.

~~95.~~126.  Although federal and New York state law requires consideration of the IHRA definition of antisemitism in consideration of antisemitism claims, as of November 2024, Abd-Alla had not required the inclusion of any reference to Israel or the IHRA definition of antisemitism in CUNY DEI training.

127.    Previous to Defendants' CUNY and  Matos hiring Defendant Abd-Alla, she was previously a Civil Rights Director atfor the Council on American-Islamic Relations, Minnesota (CAIR-MN).  https://www.cair.com/cair_in_the_news/on-the-job-with-saly-abd-alla/  (last visited January 7, 2026),

128.    While Defendant Abd-Alla was the CAIR-MN Civil Rights Director,  CAIR-MN called for the boycott, divestment and sanctioning of the Jewish State of Israel.

96.

97.129.CAIR was named by the U.S. Department of Justice as an unindicted co-conspirator in the 2008 U.S. v Holyland Foundation case – the largest terror finance case in American history – which resulted in a conviction on all 108 counts. https://archives.fbi.gov/archives/news/stories/2008/november/hlf112508; https://www.adl.org/resources/backgrounder/council-american-islamic-relations-cair; https://m.flsenate.gov/session/bill/2024/1209/analyses/h1209a.sac.pdf

98.130.Following this terrorism financing trial, the FBI severed relations with CAIR. https://www.adl.org/resources/backgrounder/council-american-islamic-relations-cair; https://m.flsenate.gov/session/bill/2024/1209/analyses/h1209a.sac.pdf)

99.131.  At least five CAIR board members or staff have been convicted or plead guilty to terrorism related charges, at least one of whom was deported from the United States. https://m.flsenate.gov/session/bill/2024/1209/analyses/h1209a.sac.pdf.  The United Arab Emirates also designated CAIR as a terrorist entity in 2014. https://m.flsenate.gov/session/bill/2024/1209/analyses/h1209a.sac.pdf.

**Formatted:** Font: 12 pt, Font color: Custom Color(RGB(71,71,73))

**Formatted:** Justified, Indent: Left:  0.51", First line:  0.5", Right:  0", Line spacing:  single,  No bullets or numbering, Tab stops: Not at  1.51"

**Formatted:** Justified, Indent: Left:  1.01",  No bullets or numbering

100.132.    In 2023, President Biden disavowed CAIR after its director declared that

he            "was          happy"          about          October          7ᵗʰ.

https://m.flsenate.gov/session/bill/2024/1209/analyses/h1209a.sac.pdf.

101.133.    Members of CAIR's leadership have publicly called for "Zionists" — Jews

such as Plaintiff, who believe Israel has a right to exist — to be banned from antiracist and

interfaith work. https://www.adl.org/resources/backgrounder/council-american-islamic-relations-

cair.    CAIR

leaders have also called Jews 'cursed,' and supporters of Israel 'the enemies of God and humanity.'

https://www.investigativeproject.org/8002/ipt-exclusive-cair-leader-consequence-free-anti;

https://x.com/HassanShibly/status/496006231036006400.

134.    CUNY's policy states that all Portal complaints shall be resolved within forty days

of their filing.

102.

103.135.    As of the date of this complaint, Plaintiff has not received a response to his

June 4, 2023 Portal complaint.

**Defendants Retaliatorily Announce to Plaintiff That He is Under Investigation**

104.136.    On or about July 13, 2023, Plaintiff was notified by Defendants via email

from Defendant Wade for the first time that he was under investigation for a complaint

purportedly filed four months earlier by Defendants' BMCC SJEC Program Coordinator

Defendant Nadia Saleh for his public March 2023 opposition to Defendants' discriminatory and

antisemitic poster display.

105.137.    Defendants' July 13, 2023 notice stated that it was investigating Plaintiff for Ms.

Saleh's claims that he contributed to publications which wrote false information about Saleh based

*[Margin note: Formatted: Right, Indent: Left: 1.01", No bullets or numbering]*

on her ethnicity and religion, and then shared these publications on social media.

106.138.    Defendants' policies require a preliminary review of complaints before an investigation is commenced. *See* Complaint Procedures Under The City University Of New York's Policy On Equal Opportunity And Nondiscrimination, at 2 ("A full investigation of a complaint *may* commence *when it is warranted* after a *review* of the complaint, or after informal resolution has failed")(emphasis added).

30

(https://www.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/hr/policies-and-procedures/PEONon-Discrimination12.4.2014.pdf )

107.139.    It is plain on the face of the news articles that Plaintiff was not the source of any information about Ms. Saleh.

140.    It is plain on the face of the news articles that they do not contain statements about Ms. Saleh's ethnicity or religion.

108.141.    Defendants Wade and Levy did not conduct a preliminary review of Saleh's complaint before commencing their investigation of Plaintiff, or they willfully ignored the results of that preliminary review that the allegations against Plaintiff were facially baseless.

109.142.    Upon information and belief, Defendants did not contact the authors of the publications to inquire as to the sources of the allegedly defamatory statements. One such call could have confirmed the baselessness of the allegations.

110.143.    Defendants' policies require that a copy of the complaint being investigated be provided to the person being investigated. *See* Complaint Procedures Under The City University Of New York's Policy On Equal Opportunity And Nondiscrimination, at 2 (https://www.cuny.edu/wp-content/uploads/sites/4/page-assets/about/administration/offices/hr/policies-and-procedures/PEONon-Discrimination12.4.2014.pdf)

144.    Defendants Theresa Wade and Odelia Levy refused to provide Plaintiff with a copy of the complaint against him.

145.    However, a review of Defendant Saleh's complaint against Plaintiff produced in discovery reveals that in her March 20, 2023 complaint, Defendant Saleh accused Plaintiff and Jenna Hirsch of targeting Defendant Saleh for being Muslim in their comments to the press opposing the antisemitic three-part anti-Israel program, and accused them of

31

Islamphobia and racism.

146.    Defendant Saleh's March 20, 2023 facially baseless accusations in her discrimination charge against Plaintiff and Jenna Hirsch, accusing them for the first time in their career of being anti-Muslim and racist, were eerily echoed two days later on March 22, 2023 in the false and defamatory reviews posted about Plaintiff and Jenna Hirsch on RateMyProfessors.com.

111.147.    Defendants' refusal to provide Plaintiff with adequate notice of the charges against him, ie., a copy of Defendant Saleh's complaint against him, hindered his ability to promptly and effectively defend himself.

112.148.    Upon information and belief, Defendants' targeted Plaintiff on July 13, 2023, pursuing facially baseless allegations, in retaliation for his filing a June 4, 2023 complaint of discrimination via the CUNY university wide portal.

113.149.    On information and belief, Defendants have targeted other Jewish employees by pursuing facially baseless allegations in retaliation for complaining about antisemitic treatment.

114.150.    Defendants' retaliatory investigation of Defendant remained open for approximately 15 months.

~~115.~~151.    On or about May 13, 2024, Defendants notified Plaintiff that his complaints of antisemitic discrimination regarding the public, false, defamatory and discriminatory statements about Plaintiff that appeared on RateMyProfessor.com, the failure of BMCC SJEC to respond to his request for anti-discrimination education on Jewish indigeneity in Israel, and the antisemitic online petition sponsored by Defendants' BMCC SJEC and individually signed by Defendant Saleh had not been substantiated.

152.    On or about August 12, 2024, Defendants notified Plaintiff that Nadia Saleh's complaints that Plaintiff engaged in ethnic and religious discrimination by publicly opposing Defendants' discriminatory, antisemitic poster exhibit, had not been substantiated.

**DEFENDANTS' DISCRIMINATORY WEAPONIZATION OF THE INVESTIGATION PROCESS AGAINST JEWS AND FAILURE TO CONDUCT FAIR AND LAWFUL INVESTIGATIONS OF JEWISH COMPLAINTS OF ANTISEMITISM**

153.    Defendants have targeted many other Jewish employees by pursuing facially baseless allegations in retaliation for complaining about antisemitic treatment.

154.    Indeed, there is an unmistakable pattern at Defendant CUNY and its constituent colleges: after a Jewish employee publicly opposes on campus antisemitism, as did Plaintiff herein, antisemites, in this case, Defendant Saleh, with the support of Defendant Velasquez, and the persons who posted on RateMyProfessors.com, swiftly and retaliatorily lodges a facially baseless discrimination complaint against the Jewish employee who opposed the discrimination in the first place.

155.    In response, rather than treating the Jewish victims of the facially baseless discrimination complaints the same as non-Jewish victims of facially baseless complaints, and engaging in a preliminary review to determine whether an investigation is warranted, as required by Defendant CUNY's policies, Defendant CUNY then perpetuates the retaliatory attempt to

silence the Jewish opponent of antisemitism by subjecting the Jewish employee to a prolonged, multi-month investigation of the facially baseless charges.

156. The weaponization of the investigation process at Defendant CUNY against Jewish employees, regardless of the fact that these baseless charges are of course ultimately not substantiated, is intended to retaliate against, intimidate and punish Jews who speak up against antisemitism, and it has the intended chilling effect upon many Jewish employees.

157. The facially baseless discrimination charges against Jewish employees who oppose antisemitism thus serve as weapons, akin to "SLAPP" lawsuits – strategic lawsuits against public participation— meritless *in terrorum* actions filed to burden the targeted victim with the threat of loss of employment and income and "to discourage those who might wish to speak out in the future" (*600 W. 115th St. Corp. v Von Gutfeld*, 80 NY2d 130, 138 n 1 [1992], *rearg denied* 81 NY2d 759 [1992], *cert denied* 508 US 910 [1993]).

158. Defendant CUNY, under the leadership of Defendants Rodriguez and Abd-Alla, and as executed by Defendant's Levy and Wade, thus discriminated against Plaintiff by subjecting him to a lengthy investigation on Defendant Saleh's facially baseless retaliatory claim, rather than closing the charges upon a preliminary review, when it does not subject non-Jewish employees to similar lengthy investigations for facially baseless charges.

~~116.~~159. Moreover, Defendants CUNY, BMCC, Abd-Alla, Levy and Wade, whatever they did to investigate Plaintiff's complaints about the discriminatory March 2023 three part anti-Israel program, RateMyProfessor reviews, and April 2023 anti-Israel petition signed by Defendant Saleh and Defendant BMCC's SJEC, did not apparently consider the IHRA definition of antisemitism, as required by New York state law, because had they done so, they would have substantiated the charge.

160. The weaponization of the investigation process against CUNY employees who

34

oppose antisemitism, and the failure to conduct fair and lawful investigations of Jewish claims of antisemitism, goes back many years. The following are just a few examples:

161.    In February 2018, the CUNY Kingsborough college faculty union ("Union") president sent an email to all Kingsborough faculty soliciting discrimination complaints to be discussed at an event scheduled for a Friday night (the Friday Night Event) with the intent of excluding observant Jewish faculty, knowing that they would not be able to attend an event held on the Jewish sabbath, which begins on sundown Friday.

162.    In March 2018, after complaints of religious discrimination against observant Jews' were filed against the Union, the-then CUNY Kingsborough College Chief Diversity Officer Victoria Ajibade, charged with investigating these complaints, emailed Kingsborough faculty that a religious discrimination complaint against Jews had been filed against the faculty Union and stated her "fervent hope" that the faculty Union would consider rescheduling the Friday Night Event to allow for more inclusive faculty participation.

163.    Almost immediately, the Union filed a professional misconduct complaint against Ajibade in order to prevent her from fulfilling her duty to investigate the complaints of anti-Semitism on campus

*See Lax v. City Univ. of New York*, 80 Misc. 3d 1205(A), 194 N.Y.S.3d 704 (N.Y. Sup. Ct. 2023). Ajibade left under suspicious circumstances weeks later.

164.    In or around May 2018, Meg Feeley, a Union officer, outrageously filed an internal complaint of "harassment" against CUNY Kingsborough Professor Jeff Lax, whom she had never spoken to nor met because, she admitted, she was bothered that he was documenting claims based on religious discrimination. This retaliatory, and itself harassing, "harassment" allegation revolved around one short, professional, and courteous work-related email sent by Lax

which Feeley herself admitted was "cordial" in her harassment complaint.

165.    Likewise, in 2020, Defendant CUNY allowed its retained third party investigator to send letters to Jewish CUNY college professors who had complained of on campus antisemitism stating that their claims were not substantiated, even though the third party investigator's report itself stated that the Jewish professors' claims could be substantiated in part.

166.    In 2021, the U.S. Equal Employment Opportunity Commission (EEOC) found that CUNY failed to take immediate corrective action to discrimination by the Union against observant Jews, creating a hostile work environment.

167.    In 2022, in the wake of the EEOC determination, CUNY, Kingsborough and its President established a committee to search for and hire an Assistant Dean for Diversity, Equity and Inclusion ("DEI"), for the ostensible purpose of eliminating the discrimination against Jews.

168.    On August 16, 2022,—a Jewish CUNY Kingsborough professor Jeff Lax complained to CUNY's Diversity Office investigator about discrimination, retaliation and hostile work environment, in part because Defendants CUNY, Kingsborough and its President appointed Lili Shi, an anti-Israel advocate and supporter of the anti-Zionist Boycott, Divestment and Sanctions movement against Israel, to the DEI hiring committee intended to address antisemitism, while failing to appoint any Zionist or observant Jews, citing an online media article to this effect. Another Jewish CUNY Kingsborough professor Michael Goldstein (no relation to Plaintiff) likewise tweeted that Lili Shi was antisemitic because she supported the anti-Zionist Boycott, Divestment and Sanctions movement against Israel.

169.    Swiftly thereafter, approximately one month later, on September 19, 2022, Ms. Shi filed a complaint against both Jewish CUNY Kingsborough professors alleging race and gender discrimination, stemming from acts that commenced on or around August 16, 2022, including Twitter messages and

36

online media articles targeting her, and expressed concerns regarding her "vulnerability as an immigrant."

170.    Ms. Shi, like Defendant Saleh herein, had never met either Kingsborough Jewish professor Jeff Lax against whom she leveled charges, and it was, as here, a facially baseless discrimination charge.

171.    Nonetheless, as here, Defendant CUNY did not engage in a preliminary review to determine whether an investigation was warranted, but rather opened and perpetuated the investigation of the facially baseless discrimination charge for a multi-month period, in that case, nearly six months.

172.    In that case, as here, Defendant CUNY and its investigator refused to provide a copy of the complaint to the Jewish professors.

173.    These are just a few examples of Defendants' long standing custom of aiding and abetting the weaponization of the investigation process against Jews who oppose antisemitism.

174.    Defendants' practice of subjecting Jewish employees who complain of antisemitism - and employees who are perceived to support Jewish employees who oppose antisemitism - to prolonged investigations of facially baseless retaliatory charges –– rather than conducting a preliminary review and disposing of facially baseless charges without investigation, contrary to CUNY's own policies and contrary to how they treat non-Jewish employees, is so persistent and widespread that it constitutes a custom of which policymakers must be aware.

175.    Defendants' practice of refusing to share with Jewish targets of investigations copies of the retaliatory charges lodged against them after the Jewish employees complain of antisemitism, contrary to CUNY's own rules and contrary to how they treat non-Jewish targets of investigations, is so persistent and widespread that it constitutes a custom of which policymakers must have been aware.

37

117.176.    Defendants' disparate weaponization of the investigation process against employees who oppose antisemitism would reasonably dissuade - and has dissuaded - individuals from making antisemitism claims against perpetrators.

118.

177.    On October 31, 2023, New York State Governor Kathy Hochul announced that she would appoint former New York Chief Judge Jonathan Lippman to conduct an independent review of defendant CUNY's policies and procedures related to antisemitism and discrimination.

178.    Judge Lippman released his report on September 23, 2024 after conducting hundreds of interviews on 13 CUNY campuses,  including at defendant BMCC, with the support of his law firm, Lathan Watkins LLP ("Lippman Report"). In this report, Judge Lippman noted that recently there had been an alarming number of unacceptable antisemitic incidents targeting members of the CUNY community.

179.    Defendant BMCC has had highly publicized allegations of incidents involving claims of antisemitism and retaliation against faculty members, per the Lippman Report, at 111.

180.    Antizionism can constitute antisemitism, per the Lippman Report September 23, 2024 cover letter.

181.    Some CUNY bylaws and policies had not been updated in almost a decade and so did not explicitly track applicable law on discrimination and harassment, per the Lippman Report.

182.    The First Amendment does not provide an absolute license to those at CUNY to say or do anything they want, or to do so without any potential consequences, per the Lippman

Report, at 45.

183.    For example, defamation is not a protected category of First Amendment speech, per the Lippman Report.

184.    CUNY policy also prohibits discrimination and harassment, per the Lippman Report, another carve out to the First Amendment.

185.    Indeed, the US Department of Education has stated that the fact that discriminatory harassment involves speech does not relieve the school of its obligation to respond if the speech contributes to a hostile environment, per the Lippman Report (page 102 n. 245).

186.    Similarly, Title VI bars intentional discrimination against Jews, including by stereotyping, per the Lippman Report, at 55, 62 (citing *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 607-608 (1983); *Alexander v. Choate*, 469 U.S. 287, 292-93 (1985).

187.    CUNY is required under federal law to consider the IHRA definition of antisemitism to comply with its obligations to prohibit discrimination under Title VI, per the Lippman Report.

188.    Similarly, in June 2022, Governor Hochul issued a proclamation stating that the IHRA definition is a valuable tool to determine contemporary manifestations of antisemitism. https://www.governor.ny.gov/sites/default/files/2022-06/IHRA_Antisemitism_Definition_Proclamation-2022.pdf

189.    The IHRA definition of antisemitism states that antisemitism may manifest as targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic.

190.    The Lippman report noted that there was no reason not to update CUNY"s Equal Opportunity and Non-Discrimination policy ("EOND policy") to comply with Title VI's

requirements and federal guidance.

191.    The Lippman report called upon CUNY to implement a system of mandatory training for its investigators of antisemitism that centers on the requirements of the law. Id. at 132.

192.    The Lippman report explained that IHRA provides guidance that helps explain that antisemitic speech and conduct masquerading as criticism of Israel or Zionism is still antisemitism. Id. at 133.

193.    The Lippman Report recommended that CUNY put significant focus on IHRA when it comes to understanding what constitutes antisemitism. Id. at 133.

1.

**FIRST CLAIM**
**(Religion/National Origin Discrimination Arising Under Title VII)**

2.1.    Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

3.2.    This claim is premised upon Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C. § 2000e, et seq., which prohibits employment discrimination based on, inter alia, race, religion, and national origin.

4.3.    At all relevant times, Plaintiff was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

5.4.    CUNY is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

6.5.    CUNY has been engaged in and intends to engage in a pattern of discrimination

40

against Jewish and/or Israeli employees.

7.6.    CUNY has been sued recently regarding its treatment of Jewish students and employees and is in further receipt of multiple complaints regarding such treatment.

194.    Following multiple Title VI complaints by Jewish students for antisemitism, CUNY entered into a voluntary agreement with the US Department of Education in 2024.

195.    Specifically, in June 2024, the United States Department of Education Office for Civil Rights issued a press release announcing that CUNY had entered into a Resolution Agreement to resolve several pending complaints against the university system, including one about "harassment of students based on national origin (shared Jewish ancestry) in academic year 2020-2021." *See Garrett v. City Univ. of New York*, No. 24-CV-9710 (VSB) (RWL), 2025 WL 3096550, at *1 (S.D.N.Y. Oct. 10, 2025)

8.7.

8.    Upon information and belief, CUNY discriminated against Plaintiff when CUNY imposed disparate treatment, harassed and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules.

9.    Defendant CUNY's designees regularly close discrimination charges against non-Jews without investigation because investigation is not warranted.

10.    Defendants do not go forward with investigation of approximately eighty (80) percent of discrimination charges because the claim is facially baseless.

11.    For example, in or about the same 2023-2024 time period when Defendants subjected Plaintiff to fifteen months of investigation for Defendant Saleh's facially baseless charge against Plaintiff, a baseless complaint of homophobic and/or transphobic discrimination

41

was leveled against a CUNY Kingsborough professor who was not Jewish and not Israeli.

12.     Defendants CUNY and Rodriguez's designee immediately told the non-Jewish professor what the charges were and also gave him the results immediately.

13.     Defendants CUNY and Rodriguez's designees immediately dismissed the charge of discrimination and dd not subject him to an investigation.

14.     The non-Jewish and non-Israeli professor, unlike Plaintiff, did not have to endure a multi-month wait with the sword of Damocles hanging over his head for a facially baseless allegation.

9.15.     Moreover, at the professor's request, he was moved from one department to another, and the professor was very happy with transfer.

10.16.   BMCC is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

11.17.   BMCC has been engaged in and intends to engage in a pattern of discrimination against Jewish and/or Israeli employees.

12.18.  Defendant Velasquez created a hostile work environment for Plaintiff when she approved her department's sponsorship the antisemitic poster display, speaker and movie in March 2023.

13.19.  Defendant Saleh created a hostile work environment for Plaintiff when she filed a baseless allegation of racism against Plaintiff, with Defendant Valesquez' support, and later endorsed on behalf of Defendants' SJEC Multi-Cultural Center an antisemitic petition and signed it in her own name.

Defendants CUNY, BMCC, Wade, Levy and Abd-Alla failed to conduct a good faith, reasonable investigation of Plaintiff's reports of the antisemitic, anti-Israeli treatment he endured during his employment.

14.20.

15.21.  Defendants CUNY, BMCC, Velasquez, Saleh, Wade, Levy, Abd-Alla and

Rodriguez failed to adequately respond to Plaintiff's reports of antisemitic, anti- Israeli treatment he endured during his employment.

16.22.  Upon information and belief, Defendants have conducted good faith, reasonable investigations of complaints of discrimination from Plaintiff's non-Jewish, non-Israeli counterparts.

17.23.  Upon information and belief, Defendants have adequately responded to complaints of discrimination by its non-Jewish, non-Israeli employees.

18.24.  Defendants CUNY, BMCC, Velasquez, Saleh, Wade, Levy, Abd-Alla and Rodriguez targeted Plaintiff in retaliation for his complaints of discrimination by falsely lodging allegations against and/or perpetuating the investigation of facially baseless allegations against Plaintiff.

19.25.  Defendants' conduct was sufficiently severe or pervasive that it altered the conditions of employment for the worse.

20.26.  As a direct and proximate result of Defendants' discriminatory actions, Plaintiff suffered emotional distress, humiliation, and embarrassment.

21.27.  The psychological and emotional consequences of the Defendants' actions continue to date, and, upon information and belief, will continue into the future.

22.28.  As a direct and proximate result of Defendants' discriminatory actions, Plaintiff was not appointed to the Advisory Council on Jewish Life and has suffered professional setback and monetary loss.

**SECOND CLAIM**
**(Religion/National Origin Discrimination Arising Under the New York City Human Rights Law)**

23.29.  Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

24.30.  New York City Human Rights Law, N.Y. City Admin. Code § 8-101, et seq., prohibits disparate treatment because of a person's religions and national origin, including their ancestry.

44

25.31.   Plaintiff is a "person" under §8-102(1) of the New York City Human Rights Law.

**Formatted:** Left

45

26.32.   CUNY is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

27.33.   CUNY's discriminatory and disparate treatment of Plaintiff because he is Jewish and Israeli created a hostile work environment in violation of the NYCHRL.

28.34.   CUNY discriminated against, treated disparately, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, inter alia, (1) ignoring and failing to respond to Plaintiff's complaints regarding Defendants' antisemitic, anti-Israeli actions, (2) pursuing and unreasonably prolonging a facially baseless, retaliatory investigation against Plaintiff and (3) and refusing to appoint him to the Advisory Council on Jewish Life

29.35.   CUNY's actions were done intentionally or with reckless indifference to Plaintiff's statutorily protected New York City rights.

30.36.   As a direct and proximate result of CUNY's actions, Plaintiff suffered emotional distress, humiliation, and embarrassment. The psychological and emotional consequences of CUNY's actions continue to date, and, upon information and belief, will continue into the future.

31.37.   BMCC is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

32.38.   BMCC's discriminatory and disparate treatment of Plaintiff because he is Jewish and Israeli created a hostile work environment in violation of the NYCHRL.

33.39.   BMCC discriminated against, treated disparately, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, inter alia, (1) ignoring and failing to respond to Plaintiff's complaints regarding the antisemitic, anti-Israeli treatment he endured, (2)

46

pursuing and unreasonably prolonging a retaliatory, facially baseless investigation against Plaintiff and (3) refusing to appoint him to the Advisory Council on Jewish Life

34.40.  BMCC's actions were done intentionally or with reckless indifference to Plaintiff's statutorily protected New York City rights.

35.41.  Defendant Velasquez created a hostile work environment for Plaintiff when she approved her department's sponsorship of the antisemitic poster display, speaker and movie in March 2023.

36.42.  Defendant Saleh created a hostile work environment for Plaintiff when she filed a baseless allegation of racism against Plaintiff and later endorsed on behalf of Defendants' SJEC Multi-Cultural Center an antisemitic petition and signed it in her own name.

37.43.  Defendants Wade, Levy and Abd-Alla created a hostile work environment when they failed to conduct a good faith, reasonable investigation of Plaintiff's reports of the antisemitic, anti-Israeli treatment he endured during his employment.

38.44.  Defendants CUNY, BMCC, Velasquez, Saleh, Wade, Levy, Abd-Alla and Rodriguez failed to adequately respond to Plaintiff's reports of antisemitic, anti- Israeli treatment he endured during his employment.

39.45.  As a direct and proximate result of BMCC's actions, Plaintiff suffered emotional distress, humiliation, and embarrassment. The psychological and emotional consequences of BMCC's actions continue to date, and, upon information and belief, will continue into the future.

40.46.  As a direct and proximate result of Defendants' discriminatory actions, Plaintiff was not appointed to the Advisory Council on Jewish Life and suffered professional setback and monetary loss.

**THIRD CLAIM**
**(Retaliation for Protected Activity Arising Under Title VII)**

41.47.  Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

42.48.  This claim is premised upon Title VII of the Civil Rights Act of 1964, as amended,

**Formatted:** Left

**Formatted:** Left

codified at 42 U.S.C. § 2000e, which prohibits employers from taking materially adverse employment actions in response to an employee's participation in a protected activity, including but not limited to an employee's opposition to an action taken by its employer, which the employee considers to be discriminatory.

43.49.  At all relevant times, Plaintiff was an "employee" under Title VII, 42 U.S.C. §2000e(f).

44.50.  CUNY is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

45.51.  Plaintiff opposed CUNY's unlawful, discriminatory employment practices and engaged in protected activity under Title VII.

46.52.  CUNY's retaliatory treatment of Plaintiff because of his protected activity in advancing his Title VII rights was in violation of, inter alia, Title VII, 42 U.S.C. § 2000e-3.

47.53.  CUNY retaliated against, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, inter alia making public false and defamatory statements about Plaintiff, fabricating complaints and initiating and perpetuating a bad-faith investigations of facially baseless claims against Plaintiff in retaliation for his reports of antisemitic, anti-Israeli treatment during the course of his employment, and refusing to appoint him to the Advisory Council on Jewish Life.

48.54.  CUNY's subjection of Plaintiff to such adverse and unfavorable employment actions in retaliation for his protected activity caused Plaintiff to fear working as a professor for Defendants.

49.55.  CUNY's actions were done intentionally and/or with reckless indifference to Plaintiff's federally protected Title VII rights.

50.56.  BMCC is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

49

51. 57.  Plaintiff opposed BMCC's unlawful, discriminatory employment practices and engaged in protected activity under Title VII.

52. 58.  BMCC's retaliatory treatment of Plaintiff because of his protected activity in advancing his Title VII rights was in violation of, inter alia, Title VII, 42 U.S.C. § 2000e-3.

53. 59.  BMCC retaliated against, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, inter alia, making public false and defamatory statements about Plaintiff, fabricating complaints and initiating and perpetuating a bad-faith investigation of facially baseless claims against Plaintiff in retaliation for his reports of antisemitic, anti-Israeli treatment during the course of his employment, and refusing to appoint him to the Advisory Council on Jewish Life.

54. 60.  BMCC's subjection of Plaintiff to such adverse and unfavorable employment actions in retaliation for his protected activity caused Plaintiff to fear working as a professor for Defendants.

55. 61.  BMCC's actions were done intentionally and/or with reckless indifference to Plaintiff's federally protected Title VII rights.

56. 62.  Defendant Saleh retaliated against Plaintiff when she filed a baseless allegation of racism against Plaintiff and later endorsed on behalf of Defendants' SJEC Multi-Cultural Center an antisemitic petition and signed it in her own name.

57. 63.  Defendant Velasquez retaliated against Plaintiff when she encouraged Defendant Saleh to file a facially baseless allegation of racism against Plaintiff.

58. 64.  On information and belief, Defendant Abd-Alla retaliated against Plaintiff when she directed the investigation of Saleh's facially baseless allegation of racism against Plaintiff in response to Plaintiff filing a complaint of antisemitism on Defendant CUNY's portal.

59.65.  As a direct and proximate result of Defendants' actions, Plaintiff suffered emotional distress, humiliation, and embarrassment. The psychological and emotional consequences of the Defendants' actions continue to date, and, upon information and belief, will continue into the future.As a direct and proximate result of Defendants' discriminatory actions, Plaintiff was not appointed to the Advisory Council on Jewish Life and has suffered professional setback and monetary loss.

**FOURTH CLAIM**
**(Protected Activity Retaliation Arising Under the New York City Human Rights Law)**

60.66.  Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

61.67.  New York City Human Rights Law, N.Y. City Admin. Code § 8-101, et seq., prohibits retaliation because of an employee's protected activity.

62.68.  Plaintiff is a "person" under §8-102(1) of the New York City Human Rights Law.

63.69.  CUNY is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

64.70.   CUNY retaliatory treatment of Plaintiff because of his protected activity as an employee advancing his NYCHRL rights was in violation of, inter alia, New York City Human Rights Law, § 8-107.

65.71.   CUNY discriminated and retaliated against, treated disparately, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, by, inter alia, making public false and defamatory statements about Plaintiff, fabricating complaints and initiating and perpetuating a bad-faith investigations of facially baseless claims against Plaintiff in retaliation for his reports of antisemitic, anti-Israeli treatment during the course of his employment , and refusing to appoint him to the Advisory Council on Jewish Life..

66.72.  CUNY's subjection of Plaintiff to such adverse employment actions in retaliation

for his protected activity caused Plaintiff to fear working for Defendants.

67.73. Upon information and belief, CUNY's actions were done intentionally or with reckless indifference to Plaintiff's statutorily protected New York City rights, entitling him to punitive damages under the New York City Human Rights Law.

68.74. BMCC is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

69.75. BMCC's retaliatory treatment of Plaintiff because of his protected activity as an employee advancing his NYCHRL rights was in violation of, inter alia, New York City Human Rights Law, § 8-107.

70.76. BMCC discriminated and retaliated against, treated disparately, harassed, and otherwise treated Plaintiff unfavorably as compared to similarly situated, nonprotected class coworkers subject to the same supervisor(s), manager(s), procedures and rules, inter alia, making public false and defamatory statements about Plaintiff, fabricating complaints and initiating and perpetuating a bad-faith investigations of facially baseless claims against Plaintiff in retaliation for his reports of antisemitic, anti-Israeli treatment during the course of his employment , and refusing to appoint him to the Advisory Council on Jewish Life.

71.77. BMCC's subjection of Plaintiff to such adverse employment actions in retaliation for his protected activity caused Plaintiff to fear working for Defendants.

72.78. Upon information and belief, BMCC's actions were done intentionally or with reckless indifference to Plaintiff's statutorily protected New York City rights, entitling him to punitive damages under the New York City Human Rights Law.

73.79. Defendant Saleh retaliated against Plaintiff when she filed a baseless allegation of racism against Plaintiff and later endorsed on behalf of Defendants' SJEC Multi-Cultural Center an antisemitic petition and signed it in her own name.

74.80.  Defendant Velasquez retaliated against Plaintiff when she encouraged Defendant Saleh to file a baseless allegation of racism against Plaintiff.

75.81.  On information and belief, Defendant Abd-Alla retaliated against Plaintiff when she directed the investigation of Saleh's facially baseless allegation of racism against Plaintiff in response to Plaintiff filing a complaint of antisemitism on Defendant CUNY's portal.

76.82.  Upon information and belief, Defendants Saleh's, Velasquez' and Abd-Alla's actions were done intentionally or with reckless indifference to Plaintiff's statutorily protected New York City rights, entitling him to punitive damages under the New York City Human Rights Law

77.83.  As a direct and proximate result of intentional and/or reckless Defendants' actions, Plaintiff suffered emotional distress, humiliation, and embarrassment. The psychological, emotional and economic consequences of the Defendants' actions continue to date, and, upon information and belief, will continue into the future.

78.84.  As a direct and proximate result of Defendants' discriminatory actions, Plaintiff was not appointed to the Advisory Council on Jewish Life by Defendant Rodriguez and Plaintiff has suffered professional setback and monetary loss.

**FIFTH CLAIM**
**(Violation of Procedural Due Process Rights Guaranteed by the Fourteenth Amendment of the United States Constitution Under 42 U.S.C. § 1983 )**

79.85.  Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

80.86.  Defendant CUNY, is a public university and instrumentality of the State of New York. As such, its actions are subject to the Fourteenth Amendment to the United States Constitution.

81.87.  Defendant BMCC is a public institution and instrumentality of the State of New

York. As such, its actions are subject to the Fourteenth Amendment to the United States

Constitution.

82.88. This claim is brought pursuant to 42 U.S.C. § 1983, which provides a private right of action for the deprivation of constitutional rights under color of state law.

83.89. On or about July 13, 2023, Defendants notified Plaintiff for the first time that nearly four months earlier, on March 20, 2023, Defendants BMCC SJEC employee Nadia Saleh, claimed that he "discriminated or harassed" Defendant Saleh by contributing to online to publications which that wrote false information about Saleh based on her ethnicity and religion, and then shared these publications on social media.

90. Plaintiff was not provided with timely, specific notice of the allegations against him, nor was he afforded a timely or meaningful opportunity to be heard during the pendency of the investigation.

84.91. For example, Defendants' refusal to provide a copy of Defendant Saleh's complaint hindered Plaintiff's ability to understand what the charge was based upon, and to defend against it.

85.92. The lack of timely and adequate notice deprived Plaintiff of the opportunity to understand the claims against him, gather evidence, and prepare a meaningful response.

86.93. Defendants' retaliatory investigation remained open for approximately 15 months.

87.94. Defendant's actions of failing to provide timely and specific notice, a timely opportunity to respond, and a fair, unbiased process violated Plaintiff's procedural due process rights as guaranteed under the Fourteenth Amendment to the United States Constitution.

88.95. Plaintiff has a substantial liberty interest in his employment and professional reputation.

89.96. Those interests were at stake during the investigation, and Defendant's actions

55

directly infringed upon those interests without providing constitutionally mandated due process protections.

90.97.  Defendants' actions, taken under color of state law, violated Plaintiff's constitutional rights under the Fourteenth Amendment to procedural due process, and entitle him to

relief and damages under 42 U.S.C. § 1983.

91.98.  As a direct and proximate result of Defendant's actions, Plaintiff suffered

substantial harm, including but not limited to emotional distress, psychological damages, loss of

career opportunities, reputational damages, economic injuries and other direct and consequential

damages.

**SIXTH CLAIM**
**(Violation of Equal Protection Guaranteed by the Fourteenth Amendment of the United States**
**Constitution Under 42 U.S.C. § 1983 )**

92.99.  Plaintiff incorporates by reference the preceding paragraphs as if fully stated

herein.

93.100.42 U.S.C. § 1983 provides a cause of action against any person or entity

acting under color of state law that deprives an individual of rights, privileges, or immunities

secured by the Constitution or laws of the United States.

94.101.The Equal Protection Clause of the Fourteenth Amendment prohibits state actors

from discriminating against individuals based on their religion, creed, and national origin, and

from permitting a hostile environment that subjects individuals to disparate treatment.

95.102.Defendants are public institutions and therefore state actors for purposes of 42

U.S.C. § 1983. As state entities, they are subject to the requirements of the Equal Protection

Clause and may not engage in or permit discriminatory practices based on religion or national

origin.

96.103.On or about, June 4, 2023, Plaintiff filed a complaint of discrimination through

Defendant CUNY's online "portal", referencing Defendants' March 15, 2023 antisemitic poster

exhibit, the false, defamatory and retaliatory RateMyProfessor posts, Plaintiffs' unanswered

request for anti-discrimination education on Jewish Indigeneity in Israel, and Defendants' April

57

28, 2023 antisemitic online petition ("Portal Complaint").

97. 104. Upon information and belief, on June 4, 2023, Defendant CUNY's online portal was run by its Title IX Coordinator D e f e n d a n t Saly Abd-–Alla. https://www1.cuny.edu/sites/title.

**Formatted:** Left, Indent: First line: 0.5"

98. 105. In 2023, President Biden disavowed CAIR after its director declared that he "was happy" about October 7th. https://m.flsenate.gov/session/bill/2024/1209/analyses/h1209a.sac.pdf.

99. 106. Within weeks after Plaintiff's June 4, 2023, Portal Complaint, on or about July 13, 2023, Defendants notified Plaintiff for the first time that nearly four months earlier, on March 20, 2023, Defendants' BMCC SJEC employee Nadia Saleh, claimed that he contributed to publications which wrote false information about Saleh based on her ethnicity and religion, and then shared these publications on social media.

100. 107.        Defendants perpetuated their retaliatory investigation of Mr. Goldstein for approximately 15 months, causing him substantial pain, suffering, anxiety and emotional distress.

101. 108.        On information and belief, Defendants' do not delay for four months in notifying

**Formatted:** Left

similarly situated non-Jewish, non-Israeli employees of investigations into their conduct. On information and belief, Defendants' do not perpetuate for 15 months facially baseless investigations into the conduct of similarly situated non-Jewish, non-Israeli employees.

**Formatted:** Left

102. 109.        Defendants' discriminatory action of opening and perpetuating an investigation into facially baseless allegations about Plaintiff proximately caused a violation of Plaintiffs constitutionally guaranteed right to equal protection under the Fourteenth Amendment.

**Formatted:** Left, Indent: First line: 0.5"

103. 110.        Defendants unlawfully deprived Plaintiff of rights, privileges, and immunities secured by the Constitution of the United States or other laws, including equal protection of

**Formatted:** Left

58

laws, and provisions that protect against antisemitic hostile work environments and discrimination in employment, by, in part, unlawfully creating, and then permitting, antisemitic harassment, and hostile and threatening antisemitic conduct in the workplace against Plaintiff, in violation of 42 U.S.C. § 1983.

104.111.    As a direct and proximate result of Defendants' actions, Plaintiff suffered substantial harm, including but not limited to emotional distress, psychological damages, loss of career opportunities, reputational damages, economic injuries and other direct and consequential damages.

**SEVENTH CLAIM**
**(Discrimination and Harassment in Violation of New York State Human Rights Law, Executive Law § 296(1))**

105.112.    Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein.

106.113.    New York State Human Rights Law, Executive Law § 296(1)(a), provides that it is an unlawful discriminatory practice for an employer, based on a person's religious identity or national origin, to discriminate against such individual in terms, conditions, or privileges of employment.

107.114.        New York State Human Rights Law, Executive Law § 296(1)(h), prohibits

harassment in the workplace based on a person's membership in a protected class, including

religious identity and national origin, where such harassment subjects the individual to inferior

terms, conditions, or privileges of employment.

108.115.        New York State Human Rights Law, Executive Law § 296(1)(h), states

that it is an unlawful discriminatory practice for an employer to subject an individual to

harassment because the individual opposed any practices forbidden under the Human Rights

Law, regardless of whether such harassment would be considered severe or pervasive under

precedent applied to harassment claims.

109.116.        Plaintiff is Jewish and Israeli by creed and national origin.

110.117.        CUNY is an "employer" as defined under Executive Law § 292(5) and is

subject to the requirements of the New York State Human Rights Law ("Human Rights Law").

111.118.        BMCC is an "employer" as defined under Executive Law § 292(5) and is

subject to the requirements of the New York State Human Rights Law.

112.119.        Defendants subjected Plaintiff to harassment and disparate treatment due

to his Jewish and Israeli identity by ignoring and failing to investigate Plaintiff's complaints

regarding antisemitic and anti-Israeli discrimination, by making public false and defamatory

statements about Plaintiff, and initiating and perpetuating a bad-faith investigations of facially

baseless claims against Plaintiff in retaliation for his reports of antisemitic, anti-Israeli treatment

during the course of his employment, and refused to appoint him to Defendants' Jewish Advisory

Life Council.

113.120.        Defend

ants subjected Mr. Goldstein to harassment because he        opposed

Defendants' antisemitic, anti-Israeli discrimination and harassment forbidden under the Human

Rights Law, including but not limited to by ignoring and failing to investigate and remedy

Plaintiff's complaints regarding antisemitic and anti-Israeli discrimination, making public false and defamatory statements about Plaintiff, and initiating and perpetuating a bad-faith investigations of facially baseless claims.

114.121.    Defendant Velasquez created a hostile work environment for Plaintiff when she approved her department's sponsorship the antisemitic poster display, speaker and movie in March 2023.

115.122.    Defendant Saleh created a hostile work environment for Plaintiff when she filed a baseless allegation of racism against Plaintiff and later endorsed on behalf of Defendants' SJEC Multi-Cultural Center an antisemitic petition and signed it in her own name.

116.123.    Defendants Wade, Levy and Abd-Alla created a hostile work environment when they failed to conduct a good faith, reasonable investigation of Plaintiff's reports of the antisemitic, anti-Israeli treatment he endured during his employment.

117.124.    Defendants CUNY, BMCC, Velasquez, Saleh, Wade, Levy, Abd-Alla and Rodriguez failed to adequately respond to Plaintiff's reports of antisemitic, anti- Israeli treatment he endured during his employment.

118.125.    Defendants CUNY, BMCC, Velasquez, Wade, Levy, Abd-Alla and Rodriguez targeted Plaintiff in retaliation for his complaints of discrimination by perpetuating the investigation of Defendant Saleh's facially baseless allegations against Plaintiff , and refusing to appoint him to the Advisory Council on Jewish Life.

119.126.    Defendants' actions created an intimidating, hostile, and offensive work environment for Plaintiff, as he was treated differently and unfairly compared to similarly situated, non-Jewish, non-Israeli employees.

120.127.    Defendants' actions were intentional, willful, and taken with reckless disregard for Plaintiff's rights under Executive Law § 296(1)(h).

121.128.    Defendants' actions discriminated against Mr. Goldstein in terms, conditions or

**Formatted:** Left

privileges of employment, in violation of Executive Law § 296(1)(a), and Plaintiff is entitled to all available legal and equitable remedies.

~~122.~~129.    Defendants' actions constitute unlawful harassment in violation of Executive Law § 296(1)(h), and Plaintiff is entitled to all available legal and equitable remedies.

~~123.~~130.    As a direct and proximate result of Defendants' actions, Plaintiff suffered substantial harm, including but not limited to emotional distress, psychological damages, loss of career opportunities, reputational damages, economic injuries and other direct and consequential damages.

**EIGHTH CLAIM**
**(Retaliation under New York State Human Rights Law, Executive Law § 296(1)(e))**

~~124.~~131.    Plaintiff incorporates by reference the preceding paragraphs as if fully stated herein

~~125.~~132.    New York State Human Rights Law, Executive Law § 296(1)(e), prohibits retaliation against an individual who has opposed discriminatory practices forbidden by the Human Rights Law or filed a complaint regarding such practices. The Human Rights Law provide that it is an unlawful discriminatory practice for an employer to subject an individual to harassment because of his creed or national origin.

~~126.~~133.    Plaintiff is Jewish and Israeli by creed and national origin.

~~127.~~134.    CUNY is an "employer" as defined under Executive Law § 292(5) and is subject to the requirements of the New York State Human Rights Law ("Human Rights Law").

~~128.~~135.    BMCC is an "employer" as defined under Executive Law § 292(5) and is subject to the requirements of the New York State Human Rights Law.

~~129.~~136.    Plaintiff opposed Defendants' antisemitic, anti-Israeli employment discrimination forbidden by the Human Rights Law, filed complaints, and reported antisemitic

and anti-Israeli

treatment to Defendants.

130.137.    Defendant Saleh retaliated against Plaintiff when she filed a baseless allegation of racism against Plaintiff and later endorsed on behalf of Defendants' SJEC Multi-Cultural Center an antisemitic petition and signed it in her own name.

131.138.    Defendant Velasquez retaliated against Plaintiff when she encouraged Defendant Saleh to file a facially baseless allegation of racism against Plaintiff.

132.139.    On information and belief, Defendant Abd-Alla retaliated against Plaintiff when she directed the investigation of Saleh's facially baseless allegation of racism against Plaintiff in response to Plaintiff filing a complaint of antisemitism on Defendant CUNY's portal.

133.140.    As a direct and proximate result of Defendants' discriminatory actions, Plaintiff was not appointed to the Advisory Council on Jewish Life by Defendant Rodriguez and Plaintiff has suffered professional setback and monetary loss.

134.141.    Defendants retaliated against Plaintiff by making public false and defamatory statements about Plaintiff, fabricating complaints, initiating and perpetuating a bad-faith investigation of facially baseless claims against Plaintiff and refusing to appoint him to the Jewish Advisory Life Council.

135.142.    Defendants' adverse actions were taken in retaliation for Plaintiff's protected activity, and were done intentionally, willfully, and with reckless disregard for Plaintiff's rights under Executive Law § 296(1)(e).

136.143.    Defendants' actions constitute unlawful retaliation in violation of Executive Law § 296(1)(e), and Plaintiff is entitled to all available legal and equitable remedies.

137.144.    As a direct and proximate result of Defendants' actions, Plaintiff suffered substantial harm, including but not limited to emotional distress, psychological damages, loss of

career opportunities, reputational damages, economic injuries and other direct and consequential

damages.

**NINTH CLAIM**
**(Discrimination in Violation of New York Civil Rights Law § 40 and 40-c)**

138.145.    Plaintiff incorporates by reference the preceding paragraphs as if fully stated

herein.

139.146.    New York Civil Rights Law § 40 states that all persons are entitled to full

and equal accommodations, advantages, facilities and privileges of any places of public

accommodations.

140.147.    New York Civil Rights Law § 40 states that colleges and universities, and

all educational institutions under the supervision of the regents of the state of New York, are

public accommodations.

141.148.    Defendants are colleges and universities, and educational institutions

under the supervision of the regents of the state of New York, and therefore are public

accommodations under New York Civil Rights Law § 40.

142.149.    New York Civil Rights Law § 40-c guarantees all persons within the

jurisdiction of New York State equal protection of the laws and prohibits discrimination in his or

her civil rights based on creed, national origin by any person, the state or any agency or

subdivision of the state.

143.150.    Plaintiff is Jewish and Israeli by creed and national origin.

144.151.    Plaintiff has a civil right to equal protection of the laws and to be free from

discrimination under New York Civil Rights Law § 40-c.

145.152.    Defendants discriminated against Plaintiff unfavorably as compared to

similarly situated non-Jews and non-Israelis, by, inter alia making public false and defamatory

67

statements

about Plaintiff, fabricating complaints, initiating and perpetuating a bad-faith investigations of facially baseless claims against Plaintiff , and refusing to appoint him to the Advisory Council on Jewish Life.

146.153.      Defendants' actions, inactions, negligence, and/or deliberate indifference to the hostile campus environment and their failure to protect Plaintiff from discrimination through  their ineffective deterrence and inadequate remedial measures harmed Plaintiff's unencumbered use of Defendants' facilities.

147.154.      Defendants by their actions, inactions, negligence, and/or deliberate indifference to the hostile campus environment and its failure to protect Plaintiff from discrimination through its ineffective deterrence and inadequate remedial measures denied Plaintiff full and equal access to their accommodation, advantages, facilities and privileges, and subjected him to restrictions that materially interfered with his ability to benefit from and engage in such public accommodations.

148.155.      Defendants' actions were intentional, willful, and taken with reckless disregard for Plaintiff's civil rights under New York Civil Rights Law § 40-c.

149.156.      As a direct and proximate result of these actions, Plaintiff suffered and continues to suffer substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of career opportunities, reputational damages, economic injuries  and other direct and consequential damages.

150.157.      Per N.Y. Civ. Rights Law § 40-d, Plaintiff will served notice of this complaint upon the New York State Attorney General.

151.158.      Accordingly, Plaintiff is entitled to all relief available under the NY Civil Rights Law, including damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing

Defendants to appoint Plaintiff to the Jewish Advisory Life Council; and (ii) any and all further actions required to return Plaintiff to the status quo ante.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief jointly and severally as against all of

the Defendants:

    1. Award compensatory damages in an amount to be determined at trial:

    2. Award punitive damages in an amount to be determined at trial:

    3. Disbursements, costs and attorneys' fees;

    4. Appointment to CUNY's Advisory Council on Jewish Life, and

    5. For such other further relief to this Court may seem just and proper.

ALL CONDITIONS PRECEDENT HAVE BEEN PERFORMED OR HAVE OCCURRED
PLAINTIFF DEMANDS TRIAL BY JURY

Dated: ~~July 31~~January 9, 202~~5~~6

Respectfully submitted,

National Jewish Advocacy Center, Inc.

By: _____ /s/ Abra Siegel_____
               Abra Siegel
               3 Times Square
               NY, NY 10036
               (312) 487-1281
               abra@njaclaw.org

*Attorneys for Avraham Goldstein*

71